STATE OF NORTH CAROLINA v. JAMES EDWARD JAYNES

No. 194A92-2

(Filed 20 July 2001)

### 1. Jury— capital resentencing—selection—failure to follow statutory procedure

The trial court did not commit prejudicial error in a capital resentencing proceeding by allowing prospective jurors to be selected by a procedure in violation of N.C.G.S. § 15A-1214 whereby defendant examined prospective jurors on individual voir dire prior to the State's exercising its challenges and passing the panel, because: (1) the trial court repeatedly advised defendant that he would have the opportunity to conduct his regular questioning once the panel was passed and that it would not prevent defendant from conducting further individual voir dire later if he so desired; and (2) any prejudice to defendant was the result of defendant's voluntary election to question the jurors before the State passed the panel since defendant was provided the opportunity to follow the procedure as set forth in the statute.

### 2. Jury— capital resentencing—challenge for cause—knowledge of defendant's prior death sentence—personal knowledge of victim

The trial court did not abuse its discretion in a capital resentencing proceeding by failing to excuse for cause two prospective jurors under N.C.G.S. § 15A-1212, because: (1) although one of the prospective jurors stated she doubted she could put defendant's prior death sentence completely out of her mind, she stated consistently that she could render an impartial and fair decision based solely on the evidence and law presented to her in court; and (2) the other prospective juror stated he could set aside his personal knowledge of the victim and could base his sentencing decision solely on the information that was presented in court.

### 3. Constitutional Law— effective assistance of counsel—failure to exercise peremptory challenge—trial strategy

A defendant was not deprived of his constitutional right to effective assistance of counsel in a capital resentencing proceeding by his counsel's failure to exercise a peremptory challenge to

STATE v. JAYNES

[353 N.C. 534 (2001)]

excuse a juror after defense counsel unsuccessfully attempted to get the juror removed for cause, because: (1) defendant's complaint is essentially a request that the court should second-guess his counsel's trial strategy; and (2) counsel is free to allocate his peremptory challenges as he sees fit, and counsel is not required to exercise a peremptory challenge each time a challenge for cause is denied.

**4. Jury— capital resentencing—life-qualifying questions**

The trial court did not abuse its discretion in a capital resentencing proceeding by failing to allow defendant to ask two prospective jurors life-qualifying questions during voir dire, because: (1) the challenged questions constituted improper efforts to pin down the prospective jurors regarding which specific mitigating circumstances would sway them towards a life sentence; and (2) defendant was given ample opportunity to question the prospective jurors regarding whether they would automatically vote for the death penalty.

**5. Jury— capital resentencing—excusal for cause**

The trial court did not abuse its discretion in a capital resentencing proceeding by excusing for cause two prospective jurors based on their opposition to the death penalty, because: (1) one prospective juror repeatedly indicated that she could not set aside her personal beliefs about the death penalty and consider both punishments fairly and impartially; and (2) the other prospective juror's responses demonstrated that he could not temporarily set aside his personal convictions about the death penalty and follow the law.

**6. Appeal and Error— appealability—failure to raise constitutional issue**

Although defendant contends the trial court violated his constitutional rights to introduce mitigating evidence and answer the evidence presented against him in a capital resentencing proceeding by refusing to allow defendant to testify on redirect about the length of several consecutive sentences imposed on him for crimes committed during the same transaction as the murder, defendant waived review of the constitutionality of the trial court's actions because defendant never asserted any constitutional argument concerning the exclusion of this evidence at the resentencing proceeding.

**7. Constitutional Law— right to confront witnesses—unavailable witness**

The trial court did not violate defendant's constitutional right to confront the witnesses against him in a capital resentencing proceeding by allowing the State to read the testimony of an unavailable witness who previously testified at defendant's 1992 trial concerning defendant approaching the witness about purchasing some property, defendant taking the witness to the location where the stolen cars were hidden, and defendant telling the witness how the killing occurred, because: (1) admission of prior sworn testimony does not violate the Confrontation Clause where a witness was unavailable and his prior testimony bore sufficient indicia of reliability and afforded the trier of fact a satisfactory basis for evaluating the truth of the prior statement; and (2) even though defendant contends he was unable to fully cross-examine the witness based on the fact that he was unable to use another witness's statement when questioning the pertinent witness, defendant's right to cross-examine the witnesses against him was not infringed upon since the statement did not provide any information about which defendant was entitled to cross-examine the unavailable witness at the capital resentencing proceeding.

**8. Sentencing— capital—mitigating circumstance—no significant history of prior criminal activity**

The trial court did not err in a capital sentencing proceeding by instructing the jury that submission of the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that defendant had no significant history of prior criminal activity was required by law when defendant had requested that this mitigating circumstance be submitted, because the use of this additional language to the pattern instruction that the circumstance was required by law, although improper, was harmless beyond a reasonable doubt when it was an accurate statement of the law and essentially told the jury that the evidence could reasonably support a conclusion this mitigating circumstance existed.

**9. Criminal Law— prosecutor's opening statement—victim's statements to assailants**

The trial court did not err in a capital resentencing proceeding by failing to intervene ex mero motu during the State's opening statement that the victim told his assailants to take anything

STATE v. JAYNES

[353 N.C. 534 (2001)]

they want and to just not kill him, because: (1) this evidence had been admitted under oath at defendant's trial and the same witness was expected to testify at defendant's capital resentencing proceeding; (2) it was reasonable for the State to expect that this evidence would be brought out in questioning and that it would be admissible; (3) the fact that the witness never actually testified to that statement during the resentencing proceeding under the circumstances of this case did not require the trial court to intervene ex mero motu; (4) the prosecutor never mentioned the statement again after his opening statement and did not refer to it in his closing argument; and (5) the trial court twice instructed the jury that opening statements were not evidence.

**10. Criminal Law— prosecutor's argument—lack of provocation as an aggravating circumstance**

The State did not improperly argue in its closing argument that lack of provocation was an aggravating circumstance, because the prosecutor actually argued that the reason a killing committed in the course of a robbery or burglary is considered aggravated is its arbitrariness, which was a proper comment on the nature of the aggravating circumstances to be submitted in this case.

**11. Criminal Law— prosecutor's argument—execution necessary since prison not harsh enough**

The trial court did not err in a capital resentencing proceeding by failing to intervene ex mero motu during the State's closing argument that defendant should be executed since prison conditions are not harsh enough in North Carolina, because: (1) the comments merely emphasized the State's position that defendant deserved the death penalty rather than a comfortable life in prison; and (2) the prosecutor's references to prison conditions were drawn directly from defense testimony.

**12. Criminal Law— prosecutor's argument—general deterrence**

The trial court did not err in a capital resentencing proceeding by failing to intervene ex mero motu during the State's closing argument allegedly concerning general deterrence, because the State merely asked the jury not to be numb to the violence involved in the crime it was considering.

**13. Sentencing— capital—nonstatutory mitigating circumstance—other persons bear some of the responsibility for the victim's death**

The trial court did not err in a capital resentencing proceeding by refusing to submit defendant's requested nonstatutory mitigating circumstance that other persons bear at least some of the responsibility for the victim's death, because: (1) the circumstance was so broadly worded that it could have been interpreted as referring to anyone; (2) the wording of this circumstance made it impossible to tell whether it was subsumed into other submitted circumstances; and (3) evidence underlying the requested circumstance was fully argued to the jury by defense counsel during closing argument, and the jury was free to deem it to have mitigating value and consider it under the catchall mitigating circumstance of N.C.G.S. § 15A-2000(f)(9).

**14. Sentencing— capital—nonstatutory mitigating circumstances—codefendant's treatment by the justice system**

The trial court did not err in a capital resentencing proceeding by refusing to submit three nonstatutory mitigating circumstances relating to the codefendant's treatment by the justice system and his punishment for his involvement in the offense, because: (1) our Supreme Court has consistently held that a codefendant's sentence for the same murder is irrelevant in the sentencing proceedings; and (2) the treatment of an accomplice by the criminal justice system is not a proper subject for consideration by a capital jury.

**15. Sentencing— capital—nonstatutory mitigating circumstances—consideration by jury**

The trial court did not err in a capital resentencing proceeding by its instruction to the jurors as to how they should consider nonstatutory mitigating circumstances, because our Supreme Court has repeatedly rejected defendant's argument that it was improper for the trial court to instruct that jurors could reject nonstatutory mitigating circumstances they found had no mitigating value.

**16. Sentencing— capital—death penalty—proportionate**

The trial court did not err by sentencing defendant to the death penalty for his first-degree murder conviction, because: (1) defendant was convicted on the basis of malice and premeditation and deliberation and under the felony murder rule; (2)

defendant planned ahead, broke into the victim's home and shot and killed the unarmed victim, set the victim's body and trailer on fire, and sold the victim's property afterwards; (3) the jury found two aggravating circumstances under N.C.G.S. § 15A-2000(e)(5); and (4) the fact that a codefendant received a life sentence for the same crime is not determinative of proportionality.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a 4 June 1999 judgment imposing a sentence of death entered by Johnston, J., at a resentencing proceeding held in Superior Court, Polk County, upon defendant's conviction of first-degree murder. Heard in the Supreme Court 15 March 2001.

*Roy A. Cooper, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*Janine Crawley Fodor for defendant-appellant.*

MARTIN, Justice.

On 28 January 1991 defendant James Edward Jaynes (defendant) was indicted for the first-degree murder of Paul Frederick Acker. Defendant was also indicted for first-degree arson, first-degree burglary, robbery with a dangerous weapon, and two counts of larceny of an automobile. Defendant was tried capitally at the 6 April 1992 Criminal Session of Superior Court, Polk County. The jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of all other charges. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. The trial court entered judgment in accordance with that recommendation. The trial court also entered judgments sentencing defendant to consecutive terms of imprisonment for the remaining convictions.

On appeal, this Court arrested judgment on the larceny convictions, affirmed the remaining convictions, and granted defendant a new capital sentencing proceeding based on error in the jury instructions. *State v. Jaynes*, 342 N.C. 249, 286, 464 S.E.2d 448, 470 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). At defendant's capital resentencing proceeding, the jury again recommended a death sentence for the first-degree murder conviction, and the trial court sentenced defendant to death pursuant to that recommendation.

The state presented evidence at the resentencing proceeding which tended to show the following. In the late 1980s Acker moved from New York to North Carolina to start a farming business, intending to raise cattle. He purchased land in Polk County and brought horses from New York. He put a trailer on the land and was in the process of building a house. Acker had previously run a construction business and owned a lot of carpentry, basic construction, and farming tools. He owned a Volvo and a Ford pickup truck that he kept on the property.

Lawrence Marelli (Marelli), who moved with his family to North Carolina from New York at Acker's suggestion, worked with Acker to prepare the land for cattle. Acker also employed a local man, Jerry Nelon (Nelon), to log the land. Nelon employed prison inmates on work release to help him in his logging operations. One of the inmates was Dan Marr, defendant's uncle.

On 11 October 1990 Marelli arrived for work about 7:50 a.m. and found Acker's trailer on fire. Marelli noticed that the barn door was open and that Acker's two cars were missing. He looked inside the trailer and saw a body, later identified as that of Paul Acker. Marelli went home, called 911, and then returned to the property once law enforcement had arrived. The trailer was badly damaged by fire, and a gasoline can was found inside. There were pry marks on the back door, and the telephone line had been cut. At that point, Marelli noticed that a welder, a generator, two compressors, and all of the victim's carpentry and mechanic's tools ·were missing. A few days later, Marelli accompanied officers to a location in the woods where various items had been found by a hunter. He identified the items as belonging to Acker.

A few weeks before the victim's death, the Rutherford County Sheriff's Department had been contacted by Phillip Doster (Doster) about some stolen property. Doster was a manager at the trailer park where defendant lived. Defendant introduced Doster to Shane Smith, one of defendant's friends. Defendant and Smith brought Doster some property, including a typewriter with a New York address on it. Defendant then told Doster that he knew of a millionaire from New York and that they should check out his place together some time. He also told Doster he was going to kill someone and get rich. Doster called the Sheriff's Department and was informed by investigator Ransom "Firpo" Epley (Epley) that none of the property had been reported stolen.

Upon learning the victim was from New York, Epley approached Doster on 13 October 1990 for more information. Doster took Epley to a logging road where a blue Volvo was parked. He told Epley that the car contained stolen property and that defendant claimed to have shot a man. The pickup truck was found about a mile further down the road. Doster told Epley that defendant and Smith would come back that night to get more of the property out of the Volvo.

Epley and other law enforcement officers set up surveillance. Around 8:30 p.m. that night, a Datsun stopped near the Volvo. Two men got out and one opened the trunk of the Volvo with a key. Officers subsequently arrested the two men, identified as defendant and Smith. Officers recovered the Volvo keys from defendant's pockets. A search of the two vehicles produced a television set, a cattle-injection device, a computer, a camera, a microwave, and other electronic equipment.

Doster's testimony from defendant's 1992 trial was read to the jury as follows. Doster explained that on 11 October 1990, defendant came to Doster's house and tried to sell him some tools. They drove to a pickup truck which was loaded with carpenter's tools. They next went to a Volvo, which had a computer and stereo in the trunk. Doster bought a chainsaw, a weed eater, and a car battery from defendant for $100.00. These items were later recovered by law enforcement. When Doster asked defendant where he had obtained the property, defendant laughed and said he had to kill a guy to get it.

Defendant told Doster he had developed a plan with Shane Smith to rob the victim. Defendant said he had waited while Smith knocked on the door. When the victim opened the door, Smith told him that his truck was broken and that he needed help. Defendant entered the trailer first, armed with a .22-caliber rifle. When the victim moved towards the back of the trailer, defendant shot him but did not kill him. Defendant reloaded and shot the victim again, telling Smith to do the same before the man could shoot them. Smith was carrying a .25-caliber pistol. Defendant said he shot the victim once in the head and once in the shoulder. He then poured gas on the victim and set him on fire. Doster told defendant that he did not believe him but that if anything ever came of this, he would tell the police. Defendant told him that was alright because the authorities did not have any evidence against him.

A forensic pathologist performed an autopsy on the victim's body. The pathologist testified that the body was badly burned and was

identified through dental records. The cause of death was two gunshot wounds to the head, one of the bullets being a .25-caliber. There was no evidence of smoke inhalation, showing that the victim was not alive at the time his body was burned.

After Smith was arrested, he received several letters from defendant which he turned over to police. In one, defendant told Smith he knew Smith was scared but that he had gotten them an alibi. He told Smith to write down everything he had told the police. In another letter, defendant told Smith he had seen a newspaper report that one of them had confessed and that he hoped Smith had not said anything. He told Smith that if Smith remained silent, they could "beat it" in court. He then told Smith to tear up the letter after he read it. In a third letter defendant told Smith, "This is what we're going to say." He then wrote that he had received a call at his grandmother's home, that the caller had told him to take the car and truck to Charlotte, and that his payment would be the guns and other property in the vehicles. Defendant continued, stating that they should say that they had already been to the vehicles and taken property out, which would explain their fingerprints. Defendant then told Smith not to tell the police they were communicating and to remember they had an alibi.

Defendant was detained at the Polk County jail after his arrest. There he met David Barker, a trustee in the jail. Defendant asked him to deliver the letters to Smith. He also told Barker about how he had planned and carried out the break-in, including killing Acker, stealing his property, and setting his trailer on fire.

After his trial, defendant was confined at Central Prison. In 1998 he was housed next to Tony Duckworth, another inmate. During that time, defendant talked to Duckworth about the murder and showed him newspaper clippings about his arrest. Defendant told Duckworth he had killed the victim for money. He said the victim was a millionaire and owned a nice car and truck as well as a new trailer. He also said he had surveilled the victim's residence for two or three days before killing him. Defendant told Duckworth he "got a rush" out of killing the victim and had also planned to kill his accomplice.

Defendant presented evidence from prison personnel regarding their observations of him during incarceration. A forensic psychiatrist who treated defendant while at Central Prison from 1992 to 1996 said defendant did not have psychopathic traits and was unlikely to be violent in prison. He said he met defendant when other inmates

invited defendant to participate in a group designed to help higher functioning inmates cope with life in prison. The psychiatrist said defendant was a positive member of the group, took responsibility for his own actions, and encouraged others to do the same. A program facilitator at the prison testified defendant was courteous, cooperative, and nonviolent.

Several witnesses explained defendant's childhood and family circumstances. Among them was defendant's mother, who explained that her husband was an abusive alcoholic who abused defendant more than the other children because defendant was the oldest. She also said that her husband would shoot his gun in the house and frighten the children. Defendant's father testified he used to drink at least a case of beer per day when defendant was growing up. He admitted beating defendant.

Defendant testified that, prior to these crimes, he had been convicted of possession of marijuana, common law robbery resulting from a purse snatching, attempting to obtain controlled substances by false pretenses, and traffic tickets. He said he knew Smith from school. He dropped out of high school in his sophomore year and became addicted to a variety of drugs. After his release from prison for common law robbery, defendant worked at Broyhill Furniture Company but quit when he started having drug problems again.

Defendant testified that in February 1990 he and Smith started breaking into homes to make money. Defendant was charged in some of the break-ins, and Smith paid his bond so that he could be released. Defendant agreed to help Smith break into the Acker trailer so that he could get some money to pay Smith back for the bond money. They had heard about Acker's property from defendant's uncle, Dan Marr.

Defendant testified that on 10 October 1990 he and Smith went to the Acker property, parked on the road, and walked to the trailer. Defendant carried a .22-caliber rifle, and Smith carried a .25-caliber automatic pistol. According to defendant, this was the first time they had carried guns on a break-in. They both entered the trailer through the unlocked front door. Defendant went into a bedroom where there was computer equipment. Smith exited the trailer, then knocked on the front door. When Acker answered, Smith told him that his truck had broken down and that he needed to use a phone. Acker agreed and stepped into the bedroom where defendant was located. Defendant said he assumed Acker had a gun and shot him in the

shoulder. Smith fired three shots, and defendant fired one more at Acker's head. They then loaded Acker's vehicles with goods. After driving the pickup truck to a location along a logging road, they returned in the Volvo to pick up Smith's car. At Smith's suggestion, defendant found a gas can, poured gas on the trailer and the victim's body, and lit them on fire. They drove the Volvo to the same area on the logging road, then went home. Smith hid the guns in his mother's house.

Defendant testified he had been drinking and using drugs the day of the murder. He admitted writing the letters to Smith but said he now felt great remorse for what had happened and continued to suffer nightmares about the crime. He said he had not intended to kill anyone but only intended to commit a robbery.

## JURY SELECTION

**[1]** Defendant first contends the trial court erred by allowing prospective jurors to be selected by a procedure in violation of N.C.G.S. § 15A-1214. Pursuant to that statute, the state is required to question prospective jurors, exercise its challenges, and then pass a panel of twelve to the defendant. N.C.G.S. § 15A-1214(d) (1999). The defendant then questions these same twelve prospective jurors and exercises his or her challenges. N.C.G.S. § 15A-1214(e) (1999). In this case defendant moved for individual *voir dire*. The trial judge, after consultation with the prosecutor and defense counsel in a pretrial conference and at trial, concluded that during jury selection individual *voir dire* would be conducted with regard to the issues of pretrial publicity, death qualification, and any other sensitive issues. *See* N.C.G.S. § 15A-1214(j) (1999). During jury selection, the state asked some general questions of the initial panel and then began individual *voir dire*. A procedure evolved whereby after the state completed its individual *voir dire* questioning of a prospective juror, defendant was permitted to question the prospective juror on these issues. After defendant had asked his questions, the state exercised its challenges and eventually passed a panel of twelve to defendant. Defendant then further examined the prospective jurors in that panel of twelve. Defendant did not object to this procedure.

This procedure did not comply with the mandate of N.C.G.S. § 15A-1214 in that it allowed defendant to examine prospective jurors prior to the state's exercising its challenges and passing the panel. Although defendant failed to object to this procedure, this Court has held that "when a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's

action is preserved, notwithstanding defendant's failure to object at trial." *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985); *see also State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000).

Defendant argues that he was prejudiced by the jury selection procedure in that the state was allowed to hear defendant's questions on individual *voir dire* before exercising its challenges or passing the panel. Defendant cites to one instance where defendant speculates that a prospective juror who answered questions favorably to defendant would not have been excused by the prosecutor had the statutory procedure been followed.

The record reveals, however, that the trial court repeatedly advised defendant that he would have the opportunity to conduct his regular questioning once the panel was passed and that it would not prevent defendant from conducting further individual *voir dire* later if he so desired. Thus, defendant was not compelled to ask questions on individual *voir dire* before the state passed the panel. As defendant was provided the opportunity to follow the procedure as set forth in the statute, prejudice to defendant, if any, was the result of defendant's voluntary election to question the jurors before the state passed the panel. On appeal, a party cannot claim to be prejudiced by "his own conduct" at trial. N.C.G.S. § 15A-1443(c) (1999); *see State v. Gay*, 334 N.C. 467, 485, 434 S.E.2d 840, 850 (1993); *State v. Payne*, 280 N.C. 170, 171, 185 S.E.2d 101, 102 (1971). Accordingly, because defendant has failed to demonstrate prejudice on this record, his contentions fail.

[2] In his next assignment of error, defendant contends the trial court erred by failing to excuse for cause prospective jurors Eugenia Barber (Barber) and Howard Green (Green) in violation of his constitutional right to a fair and impartial jury. First, defendant argues Barber should have been removed for cause because she was aware defendant had previously received a sentence of death. Barber admitted during *voir dire* that she had read a newspaper article about the history of the case. In response to questioning by the trial court, Barber said she could put aside her knowledge of defendant's previous sentence and render an impartial and fair decision based solely on the evidence and law presented to her in court. She further said she understood the prior proceeding was legally flawed and had no bearing on the current hearing, and she indicated she would not discuss what she knew with the other jurors. In response to questioning by defense counsel, Barber said she "would try to go on what [she]

heard in this hearing," but doubted she could completely put the information out of her mind. Barber then responded to the trial court as follows:

> THE COURT: The language that I used was even if you remembered it—
>
> [BARBER]: Right.
>
> THE COURT: If you could put that aside—
>
> [BARBER]: Aside.
>
> THE COURT: —and base your determination on the evidence—
>
> [BARBER]: On what I hear here.
>
> THE COURT: —that comes out at this hearing, because the prior proceeding was legally flawed and should have no bearing on what this jury does. Are you comfortable with that?
>
> [BARBER]: I will do my best.

N.C.G.S. § 15A-1212 provides in part that "[a] challenge for cause to an individual juror may be made by any party on the ground that the juror: . . . (9) For any other cause is unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (1999). Whether to grant a challenge for cause under N.C.G.S. § 15A-1212(9) is a matter left to the sound discretion of the trial court. *See Jaynes*, 342 N.C. at 270, 464 S.E.2d at 461. "The trial court has the opportunity to see and hear a juror and has the discretion, based on its observations and sound judgment to determine whether a juror can be fair and impartial." *State v. Dickens*, 346 N.C. 26, 42, 484 S.E.2d 553, 561 (1997).

"[M]ere knowledge by the jurors of the prior death sentence does not necessarily demonstrate prejudice to the defendant." *State v. Bacon*, 337 N.C. 66, 92, 446 S.E.2d 542, 555 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). When the trial court is able to reasonably conclude "the prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence, excusal is not mandatory." *State v. Simpson*, 331 N.C. 267, 272, 415 S.E.2d 351, 354 (1992); *see also Mu'Min v. Virginia*, 500 U.S. 415, 430, 114 L. Ed. 2d 493, 509 (1991) (relevant inquiry regarding pretrial publicity is not whether jurors remember the case but whether they have such fixed opinions that they cannot judge defendant impartially); *State v. Green*, 336 N.C. 142, 166, 443 S.E.2d 14,

28-29 (challenge for cause properly denied where juror said he would try "to the best of [his] ability" to set aside his knowledge of the defendant's prior death sentence and base his decision on the evidence presented to him, although he did not "believe there [was] any way [he] could be absolutely sure"), *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In the present case, although Barber doubted she could put the prior sentence completely out of her mind, she stated consistently that she could set her knowledge of it aside and base her judgment on the evidence presented in court. Accordingly, the trial court did not abuse its discretion by denying defendant's challenge of Barber for cause.

Defendant also contends the trial court erred by failing to excuse Green for cause. The victim was a regular customer at Green's furniture store. Green had sold the victim furniture which burned in the fire. During *voir dire*, however, Green told the trial court he could be equally fair and impartial to both sides, could set aside his personal knowledge of the victim, and could base his sentencing decision solely on the information that was presented in court. He further told the prosecutor he had no opinion yet on what the appropriate punishment should be and that he would do what the law and circumstances dictated. Finally, he told defense counsel he understood the importance of being fair to both sides and was not leaning one way or the other. These answers support the trial court's conclusion "that [Green] could put [his personal knowledge] aside and rule on the basis of the law." Accordingly, the trial court did not abuse its discretion when it denied defendant's challenge of Green for cause.

[3] Defendant next contends he was deprived of his constitutional right to effective assistance of counsel because defense counsel failed to exercise a peremptory challenge against juror Green. Defense counsel challenged Green for cause, as noted above, and argued accordingly that Green could not be fair and impartial. Defendant now asserts that because his counsel felt Green could not be fair, their failure to challenge him peremptorily constituted unconstitutionally deficient performance entitling defendant to a new sentencing hearing.

"A defendant's right to counsel includes the right to effective assistance of counsel." *State v. Grooms*, 353 N.C. 50, 64, 540 S.E.2d 713, 722 (2000). We analyze claims of ineffective assistance of counsel using a two-part test, originally articulated in *Strickland v.*

*Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693 (1984). *See State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). First, defendant must show his counsel's performance "fell below an objective standard of reasonableness." *State v. Lee*, 348 N.C. 474, 491, 501 S.E.2d 334, 345 (1998). Such a performance would include "errors so serious that [his] counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. After satisfying the first part of the test, defendant must next show he was prejudiced by the error such that "a reasonable probability exists that the trial result would have been different absent the error." *Lee*, 348 N.C. at 491, 501 S.E.2d at 345.

The decision to exercise a peremptory challenge is necessarily a tactical one for trial counsel. *See, e.g., State v. Ali*, 329 N.C. 394, 403-04, 407 S.E.2d 183, 189 (1991). Counsel are "given wide latitude in these matters." *State v. Milano*, 297 N.C. 485, 495, 256 S.E.2d 154, 160 (1979), *overruled on other grounds by State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983).

Defendant's complaint about his counsel's failure to peremptorily challenge Green is essentially a request that this Court second-guess his counsel's trial strategy. The decision to refrain from using a peremptory challenge on Green could very well have been a valid tactical choice. As noted above, Green repeatedly stated he could be fair to both sides, and a variety of his answers could have been construed as favoring life imprisonment instead of the death penalty. Trial counsel are free to allocate their peremptory challenges as they see fit, within constitutional boundaries, and are not required to exercise them each time a challenge for cause is denied regardless of whether they argued strenuously that grounds for a challenge for cause existed. Accordingly, the first prong of the *Strickland* test has not been satisfied. *See, e.g., Grooms*, 353 N.C. at 64, 540 S.E.2d at 722. This assignment of error is rejected.

[4] Defendant next assigns as error the trial court's failure to allow him to ask two prospective jurors certain "life-qualifying" questions during *voir dire* in violation of his constitutional right to a fair and impartial jury. The trial court sustained the state's objections to the following questions posed to prospective juror Tom Cantrell (Cantrell):

> [DEFENDANT]: What would you need to hear to vote for life?
>
> . . . .

[DEFENDANT]: What sort of mitigating evidence would you listen to?

Prospective juror Walter Bryant (Bryant) was asked the following questions, to which objections were also sustained:

[DEFENDANT]: . . . What would you need to hear to even consider a life sentence? What kinds of things?

. . . .

[DEFENDANT]: Can you imagine—can you imagine that there's anything that you could hear that would make you consider a life sentence?

. . . .

[DEFENDANT]: What would make you disagree with imposing the death penalty?

Defendant contends the challenged questions inquired into Cantrell and Bryant's ability to follow the law and consider mitigating evidence. He argues these questions should have been permitted pursuant to *Morgan v. Illinois*, 504 U.S. 719, 735, 119 L. Ed. 2d 492, 506 (1992) ("Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law."). *See also State v. Conner*, 335 N.C. 618, 644, 440 S.E.2d 826, 841 (1994) (defendant entitled to inquire under *Morgan* into whether a prospective juror would automatically vote for the death penalty irrespective of the facts and circumstances). In allowing inquiry into whether a juror would automatically vote for the death penalty, however, the trial court has broad discretion over "the extent and manner" of questioning during *voir dire*. *State v. Simpson*, 341 N.C. 316, 336, 462 S.E.2d 191, 202 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996). Defendant must show an abuse of discretion before we will reverse the trial court's rulings on this matter. *State v. Robinson*, 336 N.C. 78, 102, 443 S.E.2d 306, 317 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

We have held repeatedly that attempts to "stake out" a prospective juror in advance regarding what his decision might be under certain specific factual scenarios are improper. *See, e.g.*, *Simpson*, 341 N.C. at 336, 462 S.E.2d at 202; *State v. Skipper*, 337 N.C. 1, 20, 446 S.E.2d 252, 262 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). This principle was perhaps best articulated in *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980): "Counsel

should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided . . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances."

The challenged questions in the instant case constituted improper efforts to pin down the prospective jurors regarding which specific mitigating circumstances defendant would need to present in order for them to impose life imprisonment rather than the death penalty. The questions reflect improper efforts to pin down the prospective jurors regarding specific mitigating circumstances that would sway them towards a life sentence. *See Mitchell,* 353 N.C. at 319, 543 S.E.2d at 837 (" 'staking out' what the jurors' decision will be under a particular set of facts is improper"). These questions do not amount to proper inquiries into whether the prospective jurors could follow the law or the trial court's instructions. *See State v. Hill,* 331 N.C. 387, 404, 417 S.E.2d 765, 772 (1992), *cert. denied,* 507 U.S. 924, 122 L. Ed. 2d 684 (1993).

The record indicates the trial court allowed defendant ample opportunity to question both Cantrell and Bryant regarding whether they would automatically vote for the death penalty, as required by *Morgan,* 504 U.S. at 734-35, 119 L. Ed. 2d at 506. Both prospective jurors stated they could consider both punishments and follow the law as the trial judge gave it to them. Defendant was not entitled to inquire as to which specific circumstances would cause the jurors to consider a life sentence. Accordingly, defendant has not shown any abuse of discretion by the trial court in its handling of the *voir dire* in this case. This assignment of error is without merit.

[5] In his next assignment of error, defendant contends the trial court erred by excusing two prospective jurors for cause based on their opposition to the death penalty. Defendant argues that, although both prospective jurors opposed the death penalty, neither was unable to follow the law of North Carolina, making them qualified to serve on his jury.

A prospective juror is properly excused for cause because of his views on capital punishment when those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). Nonetheless, this Court is also guided by the principle

that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986).

This Court has recognized that "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). Therefore, we ordinarily "defer to the trial court's judgment as to whether the prospective juror could impartially follow the law." *State v. Morganherring*, 350 N.C. 701, 726, 517 S.E.2d 622, 637 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000). The trial court's decision to excuse a juror for cause "is discretionary and will not be disturbed absent an abuse of discretion." *State v. Blakeney*, 352 N.C. 287, 299, 531 S.E.2d 799, 810 (2000), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 780 (2001).

In the present case, prospective juror Lois Searcy (Searcy) first told the prosecutor she had given a lot of thought to how she felt about capital punishment and did not think she could ever vote to impose death regardless of the circumstances. The prosecutor then questioned Searcy as follows:

[PROSECUTOR]: Have you always felt that way?

[SEARCY]: No.

[PROSECUTOR]: Well, has your thinking about this changed over the years or could you tell me about that?

[SEARCY]: Well, I don't reckon there's anything to tell. I just, I don't know, I know this kid's father, he used to work with my ex-husband.

The next day, Searcy told the prosecutor she had been awake at three o'clock in the morning thinking about how she felt about the death penalty. The following exchange occurred:

[PROSECUTOR]: Okay, tell me what your thinking is now about that?

[SEARCY]: I don't like it.

[PROSECUTOR]: How strong is your feeling that way?

[SEARCY]: Very.

. . . .

[PROSECUTOR]: If you can explain it and I know it's hard to do, but explain why you feel that way?

[SEARCY]: Well, I have two children and I don't think I would like for them to be put to death, you know.

Searcy then said her feelings would interfere to the extent she could not be fair to each side, and she again said that she could never vote for the death penalty under any circumstances. She then told the trial court that, although she could not say she would automatically vote against the death penalty in every first-degree murder case, she would not consider it as a punishment in this case. Later, Searcy told defense counsel she could listen to the evidence and follow the law regarding weighing of aggravating and mitigating circumstances. She ultimately told the trial court, however, that she could not set aside her personal beliefs and fairly consider both life imprisonment and death as possible punishments in this case based on the law.

These responses show prospective juror Searcy's views of the death penalty would have prevented or substantially impaired the performance of her duties in this sentencing proceeding. She repeatedly indicated she could not set aside her personal beliefs about the death penalty and consider both punishments fairly and impartially. Therefore, the trial court did not abuse its discretion in excusing her for cause.

Prospective juror Burton Baer (Baer) began his *voir dire* by informing the prosecutor that he had "given a lot of thought to this in the last 24 hours and [he had] done some research, and [he] would say [his] position is that [he does] not support death as a form of criminal punishment." Later, Baer told the trial court he had done quite a bit of reading and reviewing of statistics and had decided the death penalty was unnecessary when life imprisonment was available as an alternative punishment. Baer discussed his personal views with the trial court extensively, resolving that based on his background in the military, his research, and his concern for civil rights, "unless my emotions were stirred up to the point that they overruled my logical thought pattern, then I would say I could not vote for death." He said he was willing to serve as a juror, but could not be equal or unbiased in his judgment, and did not "think it's going [to] change in any discussion we have here." He continued, saying that although he had not

made his mind up already about the case, he could not imagine any circumstances under which he would consider voting for a death sentence. When asked by defense counsel whether he could follow the trial court's instructions and the law, Baer replied, "[I]t would be difficult for me, if not impossible, to vote for death." Baer reiterated that he would listen to the state's case but could not set aside his personal feelings to consider death as a possible punishment.

Prospective juror Baer's responses reveal that his views of the death penalty would have prevented or substantially impaired the performance of his duties as a juror in this sentencing proceeding. His responses demonstrated that he could not temporarily set aside his personal convictions about the death penalty and follow the law. Therefore, the trial court did not abuse its discretion in excusing Baer for cause.

## CAPITAL SENTENCING PROCEEDING

[6] Defendant next argues the trial court erred by refusing to allow him to testify, on redirect, about the length of several consecutive sentences imposed on him for crimes committed during the same transaction as the murder. Defendant contends the trial court's actions violated his state and federal constitutional rights to introduce mitigating evidence and answer the evidence presented against him.

A review of the record, however, demonstrates that defendant never asserted a constitutional argument concerning the exclusion of this evidence at the resentencing proceeding. "Constitutional questions that are not raised and passed upon in the trial court will not ordinarily be considered on appeal." *Cummings*, 353 N.C. at 292, 543 S.E.2d at 856. As a result, defendant waived review of the constitutionality of the trial court's actions here. *See id.*

[7] By another assignment of error, defendant argues the trial court erred by allowing the state to introduce the testimony of Philip Doster from defendant's 1992 trial, in violation of defendant's state and federal constitutional right to confront the witnesses against him. Doster, who was unavailable to testify at the capital resentencing proceeding, had testified at the trial that defendant had approached him about purchasing some property, had taken him to the location where the stolen cars were hidden, and had told him how the killing occurred.

After his 1992 trial and capital sentencing proceeding, defendant filed a motion for appropriate relief (MAR) alleging improprieties relating to this trial. At the MAR evidentiary hearing, Shane Smith testified he had told the prosecutor and a police officer, prior to defendant's trial, that Doster had helped plan and organize the break-in at the Acker property. Specifically, he testified that Doster had visited the property with him and defendant several times prior to the murder and had planned to help them break in and steal the property while Acker was out of town.

At his capital resentencing proceeding, defendant contended the state should have provided him with Smith's statement about Doster's involvement, pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963), prior to his 1992 trial. Defendant argued he had been unable to fully cross-examine Doster at trial because he had been unable to use Smith's statement to impeach Doster. Consequently, he contended, Doster's statement should be excluded from defendant's capital resentencing proceeding to protect his right to confront the witnesses against him. The trial court, however, allowed Doster's prior testimony to be read to the jury. We conclude this evidence was properly admitted.

The Confrontation Clause of the Sixth Amendment, made applicable to the states by the Fourteenth Amendment, guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. A "primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937 (1965). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353 (1974).

The Confrontation Clause has been interpreted as operating

in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accu-

racy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts*, 291 U.S. [97], 107, 78 L. Ed. 674, [679 (1934)].

*Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 607 (1980) (citations omitted). Further, this Court has noted

the Confrontation Clause is not violated by the admission of a witness' recorded prior testimony where the witness

was under oath[;] [defendant] was represented by counsel . . . [;] [defendant] had every opportunity to cross-examine [the witness] as to his statement[;] and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings.

*California v. Green*, 399 U.S. 149, 165, 26 L. Ed. 2d 489, 501 (1970)), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996).

*State v. McLaughlin*, 341 N.C. 426, 458-59, 462 S.E.2d 1, 19 (1995); *see also Mancusi v. Stubbs*, 408 U.S. 204, 216, 33 L. Ed. 2d 293, 303 (1972) (admission of prior sworn testimony did not violate Confrontation Clause where witness was unavailable and prior testimony "bore sufficient 'indicia of reliability' and afforded 'the trier of fact a satisfactory basis for evaluating the truth of the prior statement' ").

In the instant case, the trial court found that Doster was unavailable to testify at defendant's capital resentencing proceeding. Defendant does not contest that finding. Moreover, Doster's testimony at defendant's 1992 trial was given under oath and was subjected to cross-examination by defendant's counsel. Such evidence would normally be presumed admissible at a later proceeding. *See, e.g., United States v. Inadi*, 475 U.S. 387, 394-95, 89 L. Ed. 2d 390, 398 (1986). Defendant contends, however, that he was unable to fully cross-examine Doster at his trial because he had not been able to use Smith's statement when questioning Doster. Resolution of this question turns on an analysis of Smith's statement.

At the hearing on defendant's MAR, Smith testified that Doster had helped defendant and Smith organize the break-in by visiting the property with them and planning how to get the goods. If Smith's statement were true, defendant would have been privy to this infor-

mation prior to his trial and could have questioned Doster about it then. *See United States v. Owens*, 484 U.S. 554, 559, 98 L. Ed. 2d 951, 957 (1988) (Confrontation Clause guarantees only the opportunity for effective cross-examination). If Smith's statement were false, on the other hand, it was not relevant and using it to cross-examine Doster would not effectively serve the purposes of cross-examination, i.e., to test the "believability of a witness and the truth of his testimony." *Davis*, 415 U.S. at 316, 39 L. Ed. 2d at 353. Consequently, in neither case would defendant's right to cross-examine the witnesses against him be infringed upon by the introduction of Doster's prior sworn testimony.

The trial court properly allowed Doster's prior testimony to be read into evidence at the capital resentencing proceeding. Defendant's confrontation rights were not violated by the introduction of the testimony because Smith's later statement did not provide any information about which defendant was entitled to cross-examine Doster at the capital resentencing proceeding. Accordingly, this assignment of error is without merit.

[8] By another assignment of error, defendant contends the trial court committed reversible constitutional error by instructing the jury in the instant resentencing proceeding that the mitigating circumstance that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1) (1999), was required by law. Defendant requested that this statutory mitigating circumstance be submitted but did not specifically request that the North Carolina pattern jury instruction language be used. The trial court agreed to submit the (f)(1) mitigating circumstance.

Although no explicit request was made that the instruction be given in conformance with the North Carolina Pattern Jury Instruction, during the charge conference all parties referred to the pattern instruction when discussing the submission of the (f)(1) mitigator. The trial court drew the parties' attention to specific language in the pattern instruction and led a discussion on whether any varying language should be used. Given these circumstances, defendant had no reason to make his own request that the pattern instruction be used or to request that no variations other than those discussed be given. Accordingly, when the instruction actually given by the trial court varied from the pattern language, defendant was not required to object in order to preserve this question for appellate review. *See State v. Keel*, 333 N.C. 52, 56, 423 S.E.2d 458, 461 (1992) (once trial court agreed to give pattern instruction, defendant not required to

request it be given; requirements of N.C. R. App. P. 10(b)(2) satisfied to preserve review); *cf. State v. Montgomery*, 331 N.C. 559, 570, 417 S.E.2d 742, 748 (1992) (written request for pattern instruction sufficient to preserve review of variant actually given).

When the trial court instructed on the (f)(1) mitigating circumstance, it prefaced the instruction with the following language: "Now with respect to the first, submission of this is required as a matter of law." This language, not part of the pattern instruction, is normally included only when the defendant has objected to the submission of this circumstance despite the presence of evidence to support it. *See* N.C.P.I.—Crim. 150-10 (1998); *State v. Walker*, 343 N.C. 216, 223-24, 469 S.E.2d 919, 923, *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996). Defendant contends the inclusion of this language amounted to a judicial comment that the submission of the (f)(1) circumstance was unjustified. Defendant also asserts that the variation from the pattern language was constitutional error, depriving him of his right to the standard pattern instruction. The jury did not find this circumstance to exist.

We believe the use of this additional language in the instruction, although improper, was harmless beyond a reasonable doubt. The statement that submission of the circumstance was required by law was an accurate statement of the law. The trial court's statement essentially told the jury that the evidence could reasonably support a conclusion this mitigating circumstance existed. Accordingly, defendant was not prejudiced by the additional language. This assignment of error fails.

Defendant next assigns error to various portions of the state's opening and closing arguments, arguing that the cumulative effect of alleged improprieties deprived him of his due process right to a fair sentencing proceeding. Defendant did not object to these arguments during his resentencing proceeding. Thus, we review the arguments "to determine [only] whether they were so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct the errors." *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). We have previously stated that "the trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). In the instant case, the record reveals that the contested portions of the state's opening and closing arguments

did not require *ex mero motu* intervention, nor did their cumulative effect unfairly prejudice defendant.

**[9]** First, defendant contends the trial court erred by allowing the state's opening statement to include matters outside the record. The prosecutor argued the victim said to his assailants, "Take anything you want, just don't kill me." This evidence was presented at defendant's trial by Curtis Barker, who testified defendant told him Acker had made that statement. Although Barker was also called as a witness at defendant's resentencing proceeding, he never repeated this statement.

Before opening statements, the trial court instructed the jury as follows: "Now opening statements are not evidence, but they're given before the proceeding so the lawyers will be able to tell you what they think the evidence is going to show." The trial court again reminded the jury that opening statements were not evidence when it instructed prior to closing arguments that "[c]losing arguments are not evidence, like opening statements are not evidence."

This Court has previously noted that

> "[w]hile the exact scope and extent of an opening statement rest largely in the discretion of the trial judge, we believe the proper function of an opening statement is to allow the party to inform the court and jury of the nature of his case and the evidence he plans to offer in support of it."

*State v. Paige*, 316 N.C. 630, 648, 343 S.E.2d 848, 859 (1986) (quoting *State v. Elliott*, 69 N.C. App. 89, 93, 316 S.E.2d 632, 636, *appeal dismissed and disc. rev. denied*, 311 N.C. 765, 321 S.E.2d 148 (1984)). Further, in " 'previewing the evidence, counsel generally should not (1) refer to inadmissible evidence, (2) 'exaggerate or overstate' the evidence, or (3) discuss evidence he expects the other party to introduce.' " *Jaynes*, 342 N.C. at 282, 464 S.E.2d at 468 (quoting *State v. Freeman*, 93 N.C. App. 380, 389, 378 S.E.2d 545, 551 (citations omitted), *disc. rev. denied*, 325 N.C. 229, 381 S.E.2d 787 (1989)).

In the present case, the prosecutor's statement regarding what the victim allegedly told his attackers was within the proper scope of an opening statement. The evidence had been admitted under oath at defendant's trial, and the same witness was expected to testify at defendant's capital resentencing proceeding. It was reasonable for the state to expect that this evidence would be brought out in questioning and that it would be admissible. In any event, the fact that

Barker never actually testified to that statement during the resentencing proceeding, under the circumstances of this case, did not require the trial court to intervene *ex mero motu* to prevent alleged prejudice to defendant. A review of the record reveals the state questioned Barker extensively at the resentencing proceeding about what defendant had told him about the killing. Despite several questions about his communication with defendant, Barker never repeated the information he had given at the trial about what Acker had said to his assailants. The prosecutor never mentioned the statement again after his opening statement and did not refer to it in closing argument. Finally, the trial court twice instructed the jury that opening statements were not evidence. Accordingly, defendant was not prejudiced by the trial court's failure to further instruct the jury to disregard the statement.

**[10]** Second, defendant contends the state improperly argued that lack of provocation was an aggravating circumstance in its closing argument. Defendant objects to the following portion of the state's closing argument:

> This is worse than a killing where two people fought over a boundary line for years and years and years, and one of them wakes up one morning and says I've had it; I'm going over there and do away with Harold. And that happens, and that's first-degree murder. But it's not aggravated. There's at least some rational explanation for that killing, why that person had to die. There is no rational explanation for why poor Mr. Acker had to die. And that's why it's an aggravating circumstance.

Nonetheless,

> statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.

*Green*, 336 N.C. at 188, 443 S.E.2d at 41. In the instant case, the portion of the state's argument to which defendant now objects was given in the middle of a discussion about the aggravating circumstances to be submitted and what made this killing aggravated. The prosecutor argued that the reason a killing committed in the course of a robbery or burglary is considered aggravated is its arbitrariness, *i.e.*, in such a case the killing is done not because of who the victim

**STATE v. JAYNES**

[353 N.C. 534 (2001)]

is or what he has done to provoke it but merely because the killer is interested in getting the victim's property. This argument was a proper comment on the nature of the aggravating circumstances to be submitted in this case. The challenged portion of the state's argument served to explain why, because of the arbitrary nature of the crime, the law considers it to be an aggravating circumstance that the killing was done in the course of a burglary or robbery. It did not suggest the jury should consider a new, nonstatutory aggravating circumstance. We note "[c]ounsel are afforded wide latitude in arguing hotly contested cases" such as this one and conclude that this argument was reasonable when considered in context. *Gregory*, 340 N.C. at 424, 459 S.E.2d at 672.

**[11]** Next, defendant contends the state improperly argued that defendant should be executed because prison conditions are not harsh enough in North Carolina. In closing argument, the prosecutor pointed out that if sentenced to life imprisonment, defendant would continue to have access to various prison amenities, such as art classes, a library, counseling, and correspondence courses. As we have held in several prior cases, these comments reasonably "served to emphasize the [s]tate's position that the defendant deserved the penalty of death rather than a comfortable life in prison." *State v. Alston*, 341 N.C. 198, 252, 461 S.E.2d 687, 717 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996); *see also, e.g., State v. Holden*, 346 N.C. 404, 430, 488 S.E.2d 514, 528 (1997), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998); *State v. Reeves*, 337 N.C. 700, 732, 448 S.E.2d 802, 817 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995).

Defendant contends, however, that because this Court has previously held a defendant may not inform jurors about execution procedures in order to persuade them to return a life sentence, the state should not be allowed to argue that comfortable conditions in prison provide a reason to execute defendant. The cases to which defendant refers have held evidence on execution procedures to be inadmissible because it "was in no way connected to defendant, his character, his record or the circumstances of the charged offense." *State v. Johnson*, 298 N.C. 355, 367, 259 S.E.2d 752, 760 (1979); *see also, e.g., State v. Holden*, 321 N.C. 125, 163, 362 S.E.2d 513, 536 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In contrast, at the instant trial, the prosecutor's references to prison conditions were drawn directly from defense testimony. "A prosecutor in a capital trial is entitled to argue all the facts submitted into evidence as well

as any reasonable inferences therefrom." *Gregory*, 340 N.C. at 424, 459 S.E.2d at 672. Defendant's argument fails.

**[12]** Finally, defendant contends the prosecutor improperly argued general deterrence when he stated:

> Now I ask you, please do not take a casual approach to this notion of murder. We hear that in this country we see that, the pundits tell us that people are becoming immune to violence such as this. If that's true, woe be unto us. But the State of North Carolina doesn't look at it this way, and you shouldn't either.
>
> Do not be casual in your approach to violent crime such as this.

Defendant correctly points out that the state may not argue general deterrence in its summation, despite the wide latitude afforded it in closing argument. *See, e.g., State v. Golphin*, 352 N.C. 364, 470, 533 S.E.2d 168, 236 (2000), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 69 U.S.L.W. 3618 (2001). Here, however, it appears the state merely asked the jury not to be numb to the violence involved in the crime it was considering. This argument was not improper.

In summary, the arguments to which defendant assigns error were not improper. Thus, whether viewed individually or in the aggregate, these arguments did not result in a denial of due process or fundamental fairness to defendant. This assignment of error is meritless.

**[13]** Defendant next assigns error to the trial court's refusal to submit his requested nonstatutory mitigating circumstance, "[o]ther persons bear at least some of the responsibility for the death of Mr. Acker."

To show that a requested nonstatutory mitigating circumstance should have been submitted, defendant must demonstrate that:

> (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit such nonstatutory mitigating circumstance to the jury for its determination raises federal constitutional issues.

*State v. Benson,* 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988) (footnote omitted). We have previously defined a mitigating circumstance as

> a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, but which may be considered as extenuating, or reducing the moral culpability of the killing, or making it less deserving of the extreme punishment than other first-degree murders.

*State v. Irwin,* 304 N.C. 93, 104, 282 S.E.2d 439, 446-47 (1981). Further, "[t]he U.S. Supreme Court has held that any aspect of defendant's character, record or circumstance of the particular offense which defendant offers as a mitigating circumstance should be considered by the sentencer . . . . However, evidence irrelevant to these factors may be properly excluded by the trial court." *Id.* (citing *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973 (1978)).

In the instant case, the trial court properly declined to submit defendant's proposed nonstatutory mitigating circumstance. First, the circumstance was so broadly worded that, depending on its interpretation, it could have referred to anyone, from defendant's accomplice Shane Smith to anyone who had contact with defendant during his life prior to the killing. A mitigating circumstance should direct the jurors to *specific* aspects of the crime, defendant's character, or defendant's record which could serve as a basis for finding the defendant is less deserving of the death penalty. Further, because of the way this circumstance was worded, it is impossible to tell whether it was subsumed into other, submitted, circumstances. *See, e.g., McLaughlin,* 341 N.C. at 447-48, 462 S.E.2d at 12 (not error to fail to submit nonstatutory mitigating circumstances which are subsumed in other, submitted, circumstances). The trial court submitted thirty-eight mitigating circumstances in this case. Many of those circumstances dealt with whether defendant acted under the domination of another or under duress, with defendant's troubled childhood, and with the lack of treatment defendant received while in prison prior to committing this crime. Accordingly, it is likely that any aspects of the requested circumstance which reflected on defendant's culpability for the crime were subsumed into the submitted circumstances.

Assuming error *arguendo,* we believe that failure to submit this circumstance was harmless beyond a reasonable doubt. Defendant

presented extensive evidence regarding others' involvement in and responsibility for the crime, including testimony from himself, his family, and his therapists. The record reveals that "evidence underlying the requested circumstance was fully argued to the jury by defense counsel during closing argument." *Blakeney*, 352 N.C. at 317-18, 531 S.E.2d at 820. Further, the trial court submitted N.C.G.S. § 15A-2000(f)(9), the catchall mitigating circumstance, to the jury. Consequently, the mitigating information proffered by defendant was before the jurors, and they were free to "deem it to have mitigating value and consider it under N.C.G.S. § 15A-2000(f)(9)." *Gregory*, 340 N.C. at 415, 459 S.E.2d at 667. Accordingly, any error by the trial court was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1999).

**[14]** In a similar vein, defendant next argues the trial court erred by refusing to allow him to submit three nonstatutory mitigating circumstances relating to his codefendant's treatment by the justice system and punishment for his involvement in the offense. In a written request, defendant asked the trial court to submit the following:

41. The co-defendant, Shane Smith, was allowed to plead to second degree murder and receive a sentence of life in prison.

42. The defendant and co-defendant, Shane Smith, have been treated differently by the criminal justice system.

. . . .

46. . . . [T]he co-defendant, Shane Smith, was allowed to escape a jury deciding whether or not he should receive the death penalty . . . .

Defendant argues these circumstances were relevant mitigating evidence under *State v. Roseboro*, 351 N.C. 536, 528 S.E.2d 1, *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 498 (2000), and *Parker v. Dugger*, 498 U.S. 308, 112 L. Ed. 2d 812 (1991). He further suggests we overrule our prior holdings to the contrary, as expressed in *Irwin*, 304 N.C. 93, 282 S.E.2d 439, and subsequent cases.

This Court has consistently held that "a codefendant's sentence for the same murder is irrelevant in the sentencing proceedings." *State v. Meyer*, 353 N.C. 92, 102, 540 S.E.2d 1, 7 (2000); *see also State v. Sidden*, 347 N.C. 218, 231, 491 S.E.2d 225, 232 (1997), *cert. denied*, 523 U.S. 1097, 140 L. Ed. 2d 797 (1998); *State v.*

*Williams,* 305 N.C. 656, 687, 292 S.E.2d 243, 261-62, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). Similarly, we have held "that the treatment of an accomplice by the criminal justice system is not a proper subject for consideration by a capital jury." *State v. Womble,* 343 N.C. 667, 688, 473 S.E.2d 291, 303 (1996), *cert. denied,* 519 U.S. 1095, 136 L. Ed. 2d 719 (1997). We have analyzed and rejected the claim that *Parker* requires a different holding. *See, e.g., State v. Ward,* 338 N.C. 64, 114-15, 449 S.E.2d 709, 737 (1994) (*Parker* interpreted Florida law and did not imply as a general matter that evidence of a codefendant's sentence is uniformly relevant mitigating evidence), *cert. denied,* 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995).

Despite this precedent, defendant argues that *Roseboro* signaled an acknowledgment by this Court that evidence regarding a codefendant's sentence may properly be considered in mitigation. We rejected this same contention in *Meyer,* 353 N.C. at 103, 540 S.E.2d at 7, and continue to so hold here. This assignment of error is rejected.

**[15]** By another assignment of error, defendant contends the trial court improperly instructed the jurors as to how they should consider nonstatutory mitigating circumstances. Defendant's argument has two components. First, he argues the trial court improperly instructed the jurors they could reject nonstatutory mitigating circumstances they found had no mitigating value. This Court has repeatedly rejected this argument. *See, e.g., State v. Keel,* 337 N.C. 469, 495-97, 447 S.E.2d 748, 762-63 (1994), *cert. denied,* 513 U.S. 1198, 131 L. Ed. 2d 147 (1995); *Hill,* 331 N.C. at 417-18, 417 S.E.2d at 780. We decline to revisit this issue.

Defendant also argues that, regardless of the propriety of a general instruction that jurors were free to reject nonstatutory mitigating circumstances if they found they had no mitigating value, such an instruction was error in reference to the circumstance that defendant had adjusted well to incarceration. Defendant contends that circumstance was found to have mitigating value as a matter of federal constitutional law in *Skipper v. South Carolina,* 476 U.S. 1, 7, 90 L. Ed. 2d 1, 8 (1986), and so it should be treated like a statutory mitigating circumstance here. Defendant did not object to this instruction at his resentencing proceeding but asks that we review this issue for plain error.

We have consistently rejected this argument in prior cases. *See, e.g., State v. Burr,* 341 N.C. 263, 311, 461 S.E.2d 602, 628 (1995), *cert.*

*denied,* 517 U.S. 1123, 134 L. Ed. 2d 526 (1996); *State v. Basden,* 339 N.C. 288, 303-04, 451 S.E.2d 238, 246-47 (1994), *cert. denied,* 515 U.S. 1152, 132 L. Ed. 2d 845 (1995). Accordingly, the trial court properly instructed the jurors on consideration of nonstatutory mitigating circumstances. This assignment of error is overruled.

## PRESERVATION

Defendant raises seven additional issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving these issues for possible further judicial review: (1) the trial court lacked jurisdiction to try or impose judgment on defendant for first-degree murder because the short-form murder indictment did not allege all the elements of first-degree murder or any aggravating circumstance making defendant eligible for the death penalty; (2) the trial court erred by submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance twice, for each of the two felonies in which defendant was engaged when the murder was committed; (3) the trial court erred in instructing that each juror "may," rather than "must," consider any mitigating circumstances the juror determined to exist when deciding sentencing Issues Three and Four; (4) the trial court erred by placing the burden of proof on defendant to satisfy the jury with respect to mitigating circumstances and by failing to instruct jurors that proof by the preponderance of the evidence is proof which indicates it is more likely than not that a mitigating circumstance exists; (5) the trial court erred by instructing the jury it had to be unanimous to answer "no" to Issues Three and Four on the issues and recommendation as to punishment form; (6) the trial court erred by instructing the jury at Issues Three and Four that each juror could consider only mitigating circumstances previously found by that juror at Issue Two; and (7) the trial court erred by failing to instruct the jury that a life sentence would be imposed unless it found the aggravating circumstances outweighed the mitigating circumstances.

We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these assignments of error.

## PROPORTIONALITY REVIEW

[16] Having concluded that defendant's capital resentencing proceeding was free of prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any

aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury found two aggravating circumstances: (1) the murder was committed while defendant was engaged in the commission of first-degree burglary, N.C.G.S. § 15A-2000(e)(5); and (2) the murder was committed while defendant was engaged in the commission of armed robbery, N.C.G.S. § 15A-2000(e)(5).

Of the thirty-eight statutory and nonstatutory mitigating circumstances submitted, one or more jurors found the existence of the following nonstatutory circumstances in mitigation: (1) defendant has no significant history of prior violent criminal activity; (2) defendant's mental and emotional age at the time of the murder was a mitigating circumstance; (3) defendant was physically and mentally abused as a child; (4) defendant began to abuse alcohol and drugs at an early age; (5) defendant, while at a young age, observed his mother being abused by his father; (6) defendant grew up in poverty; (7) defendant never received any emotional support from his parents; and (8) defendant did not finish high school.

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, there is no indication that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We turn now to our final statutory duty of proportionality review.

In conducting our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). One purpose of our proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Atkins,* 349 N.C. at 114, 505 S.E.2d at 129 (quoting *Holden,* 321 N.C. at 164-65, 362 S.E.2d at 537). We have found the death penalty disproportionate in seven cases.

*Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation. This Court has held that "a finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.' " *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Here, defendant planned ahead, broke into the victim's home in the hopes of getting "rich," shot and killed the unarmed victim, set his body and trailer on fire, and sold his property afterward. We note particularly that the conduct of defendant that led to the victim's death was carried out in the victim's own home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] . . . an especially private place, one [where] . . . a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998).

We also compare the present case with cases in which this Court has found the death penalty proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court considers all the cases in the pool of similar cases when engaging in proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out the duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998).

This Court has previously held that the (e)(5) statutory aggravating circumstance, standing alone, is sufficient to sustain a death sentence. *See, e.g., Bacon*, 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8; *State*

*v. Zuniga,* 320 N.C. 233, 274-76, 357 S.E.2d 898, 923-24, *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987). In the present case, the jury found two aggravating circumstances, both of which were the (e)(5) circumstance. Thus, this case is more similar to cases in which we have found a sentence of death proportionate than to those in which we have found a sentence of death disproportionate.

Defendant further contends his death sentence was disproportionate because Shane Smith received a life sentence whereas defendant received a death sentence. However, this Court has determined that "the fact that a defendant is sentenced to death while a codefendant receives a life sentence for the same crime is not determinative of proportionality." *State v. McNeill,* 349 N.C. 634, 655, 509 S.E.2d 415, 427 (1998), *cert. denied,* 528 U.S. 838, 145 L. Ed. 2d 87 (1999). Further, "[d]isparity in the sentences imposed upon codefendants does not result in cruel and unusual punishment and is not unconstitutional." *Gregory,* 340 N.C. at 424, 459 S.E.2d at 672.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green,* 336 N.C. at 198, 443 S.E.2d at 47. Based upon the characteristics of this defendant and the crime he committed, we are convinced that the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate.

Accordingly, the judgment of the trial court sentencing defendant to death must be left undisturbed.

NO ERROR.