STATE OF NORTH CAROLINA v. CHRISTOPHER LAMAR WILSON

No. 106PA98

(Filed 18 December 2001)

## 1. Homicide— first-degree murder—short-form indictment

The short-form murder indictments used to charge defendant with two counts of first-degree murder were constitutional and defendant has presented no compelling reason why the Supreme Court should reexamine this issue.

## 2. Constitutional Law— due process—effective assistance of counsel—adequate period for preparation of case for trial

A defendant was not denied his rights to due process and effective assistance of counsel in a first-degree murder prosecution even though defendant's case was called for trial only twenty-seven days after assistant counsel was appointed, because: (1) defendant did not object at trial to the brevity of time for assistant counsel to prepare, nor did he move for a continuance; (2) the Supreme Court will not consider constitutional arguments raised for the first time on appeal; (3) the change in assistant counsel did not affect defendant's ability to object to this alleged error since the same lead counsel represented defendant from counsel's initial appointment until the trial began over a year later; and (4) plain error review has been applied only to jury instructions and evidentiary rulings, and even if it did apply, merely referring to the trial court's action as plain error in the assignment of error without supporting argument is insufficient to invoke this analysis. N.C.G.S. § 7A-450(b1); N.C. R. App. P. 10(b)(1).

## 3. Homicide— first-degree murder—failure to instruct on lesser-included offense

The trial court did not err in a first-degree murder prosecution by failing to instruct the jury on the lesser-included offense

of second-degree murder, because: (1) even if the evidence was sufficient to permit a jury to rationally determine that defendant acted without premeditation and deliberation, submission of second-degree murder would not necessarily be mandated in this case where defendant was also found guilty on the basis of felony murder; (2) even if it were assumed that defendant did not commit robbery or attempted robbery, the evidence was undisputed that defendant acted in concert with his coparticipant and that the coparticipant committed robbery; (3) the evidence would not permit a rational jury to find that defendant was not engaged in the commission of a felony at the time of the murders since under a theory of acting in concert defendant would also be guilty of robbery with a dangerous weapon regardless of whether he actually committed or attempted to commit the robbery himself; and (4) no evidence supports a conclusion that defendant had withdrawn from a common plan with his coparticipant to commit robbery with a dangerous weapon.

**4. Homicide— first-degree murder—trial court changed mind on submission of second-degree murder**

The trial court did not err in a first-degree murder prosecution by originally agreeing to instruct on second-degree murder and then, after defense counsel had begun closing arguments, directing defense counsel to tell the jury that the trial court had changed its mind and would not submit second-degree murder, because: (1) the trial court's ruling did not express the judge's opinion on the issue of premeditation and deliberation to the jury since the court merely offered that counsel could blame the incorrect argument on the court's ruling, and counsel could have chosen instead to claim that he had been mistaken; (2) defendant's strategic choice to reveal the trial court's ruling to the jury was not error entitling him to relief since a defendant cannot claim to be prejudiced by his own conduct, N.C.G.S. § 15A-1443(c); (3) the error would at most have revealed to the jury only that the trial court did not agree that the evidence supported a finding that defendant committed second-degree murder, and the jury was made aware that the action was required by law and was not based on the judge's opinion of the facts the jury was to decide; (4) counsel actually told the jury that the State had caused the circumstances that led the judge to be unable to submit second-degree murder; and (5) defendant fails to explain how he was prejudiced given the brevity of defense

counsel's comments, and defendant was not discredited by the contradiction.

**5. Constitutional Law— due process-right to a fair trial— effective assistance of counsel—correction of misstatement in closing argument**

The trial court did not violate defendant's rights to due process, a fair trial, and effective assistance of counsel in a first-degree murder prosecution by ordering defense counsel to tell the jury after defendant's closing argument was completed that one can commit armed robbery upon a person who is dead, because: (1) defendant did not object to the trial court's ruling at trial and made no argument raising a constitutional issue to the trial court; (2) plain error review is generally limited to jury instructions and evidentiary rulings, and even if this review were available, defendant has failed to specifically allege and argue plain error; (3) defendant is unable to show any prejudice from the alleged error since counsel's statements could have misled a jury to think that robbery cannot be committed where the victim is dead; and (4) by being allowed to tell the jury himself, counsel had the opportunity to minimize the damage to his credibility created by the correction.

**6. Homicide— requested instruction—imperfect self-defense**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for his requested instruct on imperfect self-defense, because: (1) self-defense, perfect or imperfect, is not a defense to first-degree murder under the felony murder theory, and only perfect self-defense is applicable to the underlying felonies; and (2) no evidence tended to negate that defendant committed robbery with a dangerous weapon by acting in concert with his coparticipant.

**7. Appeal and Error— preservation of issue—type of gun— distance gun fired**

Defendant did not preserve for appeal the admission over objection of an SBI agent's testimony that a six inch barrel gun could have been used during commission of the crimes at a distance of less than three feet from the victim, because: (1) defendant chose to withdraw his objection; and (2) defendant failed to allege plain error to this issue.

STATE v. WILSON

[354 N.C. 493 (2001)]

## 8. Constitutional Law— right to remain silent—evidence of defendant's invocation of right

The trial court did not err in a first-degree murder prosecution by admitting evidence that defendant exercised his right to remain silent, because: (1) the record discloses that at the time defendant invoked his right to remain silent, he had already admitted to the officers that he had committed the armed robbery and disposed of the gun; (2) the prosecutor never implied that defendant's statement was an admission of guilt; and (3) it cannot be said as a matter of law that a reasonable probability exists that the outcome of the trial would have been different had the trial court not admitted into evidence defendant's invocation of his right to remain silent.

## 9. Criminal Law— restraint of defendant during trial— shackle or leg brace—safety

The trial court did not abuse its discretion in a first-degree murder prosecution by ordering, over defendant's objection, that defendant be restrained throughout the trial with either a shackle or a leg brace for safety reasons, because: (1) an officer testified that officers had a lot of trouble with defendant while he was in jail, including his involvement in at least two fights; (2) the trial court considered the seriousness of the charges against defendant, and made the ultimate determination on the issue after hearing the officer's testimony; and (3) nothing in the record supports a conclusion that the restraint violated defendant's constitutional rights since defendant was restrained by a leg brace hidden under his clothing, and the trial court allowed defendant to walk to the witness stand outside the presence of the jury to avoid any possible prejudice.

## 10. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder as to one of the victims on the basis that the evidence was allegedly insufficient to find that either defendant or his coparticipant fired the bullet that caused that victim's death, because the evidence viewed in the light most favorable to the State reveals that: (1) two of the bullets recovered from the victim store clerk's body were .38-caliber, which could not have been fired from the other store clerk's or the coparticipant's handgun, and that one of those bullets was

**STATE v. WILSON** ·

[354 N.C. 493 (2001)]

consistent in weight, caliber, brand, and design with the bullets later found in defendant's jacket pocket; and (2) substantial circumstantial evidence rising above mere suspicion and conjecture exists to show that the third fatal bullet was also fired from defendant's gun rather than by the other store clerk.

**11. Sentencing— aggravating factor—armed robbery—carrying concealed weapon**

The trial court did not improperly aggravate defendant's armed robbery sentence by finding that he was carrying a concealed weapon, because: (1) the trial court's written findings clarify that the trial court actually considered a prior conviction for carrying a concealed weapon as an aggravating factor instead of defendant's carrying of a concealed weapon in the present case; and (2) the trial court's misspoken oral finding is not controlling where the more carefully crafted and deliberate written finding required by the Fair Sentencing Act under N.C.G.S. § 15A-1340.4(b) reveals that the trial court actually relied upon a different proper aggravating factor.

Justice BUTTERFIELD concurring.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review judgments imposing sentences of life imprisonment entered by Burroughs, J., on 7 April 1995 in Superior Court, Cleveland County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 31 July 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 17 October 2001.

*Roy A. Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Christopher Lamar Wilson was indicted for the first-degree murders of C. Ervin Lovelace and Hugh Wayne Marcrum, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. Defendant was tried capitally and was found guilty of two counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He

was also found guilty of robbery with a firearm and conspiracy to commit robbery with a firearm. Following a capital sentencing proceeding, the jury recommended sentences of life imprisonment for the murder convictions. Accordingly, the trial court sentenced defendant to two sentences of life imprisonment to be served consecutively; the trial court also sentenced defendant to consecutive terms of forty years' imprisonment for the robbery with a firearm conviction and ten years' imprisonment for the conspiracy to commit robbery with a firearm conviction.

The State's evidence tended to show that on 30 November 1993, Cassandra Adams drove defendant; defendant's ex-girlfriend, Ashley Dye; and Shalan Wilson ("Shalan") to a fast-food restaurant. After Adams got her food, she and Dye sat on the hood of the car talking while defendant and Shalan talked to another man, Derrick Floyd, off to the side of the car. Dye told Adams that she "knew what [defendant] and [Shalan] had been doing" and that they should rob Little Dan's, a convenience store located in Kings Mountain, North Carolina, as "the camera was broken, they did not have a security system and they did not have a red button beside the cash register."

Later that day defendant told Dye that he had overheard her earlier statements about Little Dan's and asked her for more details. Dye reiterated the information; she added that the store had no safe and that the cash was kept in a bag behind a curtain underneath the cash register. Dye also stated that the next night, 1 December 1993, two women would be working and would not have a gun in the store. Dye further told defendant that if a man was working, he would have a gun. Defendant asked Dye where the gun would be if the man was working, and Dye responded that it would be under the cash register. After driving around for a time, Adams took Shalan, defendant, and Dye to their respective homes.

On 2 December 1993 Adams, Dye, and defendant spoke together on the telephone. Dye asked if Adams was "still going to do that tonight." Adams stated that she had not made up her mind yet. Adams picked up defendant in her mother's car around 9:00 p.m. that evening and told defendant that she was scared and did not want to go through with the robbery. Adams and defendant drove to Shalan's home, where Adams told Shalan that she was "scared and [she] thought something was going to go wrong, and [she] didn't want to do it." Shalan "started waving his arms around" and told Adams that they were going to go through with the robbery as planned and that she

"was not going to chicken out on him." Adams, defendant, and Shalan then got into the car, whereupon Adams noticed that Shalan had a black nine-millimeter gun and a pair of gloves with him.

Adams, defendant, and Shalan then drove around for awhile, unsuccessfully attempting to locate Dye. They drove to Little Dan's, but Adams again became worried upon seeing the number of cars in the parking lot. Adams continued past Little Dan's and looked for Dye at an apartment complex near the convenience store. Again unsuccessful in her attempt to locate Dye, Adams drove past Little Dan's to a truck stop to buy gloves for defendant, noting that all of the cars in the Little Dan's parking lot were now gone. Adams then drove defendant and Shalan past Little Dan's again to see how many cars were in the parking lot. Adams turned the car around and let defendant and Shalan out of the car, then drove away to a nearby road.

After a short time Adams drove back to Little Dan's and saw defendant and Shalan running toward the car. After defendant and Shalan got back into the car, Adams began driving towards Gastonia, North Carolina. At that point she noticed that defendant had a .38-caliber gun with him and that Shalan had another gun, a "silverish, shiny revolver." When she asked what had happened, defendant stated: "He tried to play hero[,] and I had to pop him." Adams asked defendant whether the man was dead; and defendant replied, "They're dead." At this point Adams realized for the first time that two men were dead. Adams then drove defendant and Shalan back to their respective homes.

Earlier that evening, in response to information from a store employee that "an attempted holdup" might happen at Little Dan's that night, officers with the Kings Mountain Police Department alerted the store clerks and began surveillance of the store. The record is unclear as to who relayed this information to the police department. Officer Ron Creech went to Little Dan's with his partner, Officer Tessneer, around 10:15 p.m. on 2 December 1993. The officers began their shift surveilling the store from their car, which was parked two to three hundred yards from the store. After watching the store for approximately forty minutes, the officers noticed two black men come around the corner of the store and "trot" to the front door, crouching below the front windows. In response to this suspicious activity, the officers called for backup and began driving toward the store. The two men exited the store after approximately ten seconds, running in the opposite direction from which they had come. The offi-

cers lost sight of the men and began searching for them. Unable to locate the men, the officers returned to Little Dan's, where the backup units were arriving. The backup units continued searching for the suspects while Officers Creech and Tessneer entered the store to check on the clerks. The officers discovered the dead bodies of both clerks on the floor behind the counter.

The victims had been shot in numerous places, and the crime scene investigators observed blood on and around the bodies. The investigators also noticed a bullet fragment near one victim's head, a copper-jacketed bullet on the floor in a shopping aisle of the store, and a nine-millimeter Luger shell casing on the floor behind the other victim; an empty brown leather holster was also found underneath this victim.

The pathologist who performed the autopsy on victim Marcrum discovered three gunshot wounds: one bullet entered the right cheek, broke the mandible, and exited through the neck. A second bullet entered the right side of the back, hit the collarbone, and lodged at the base of the neck. A third bullet also entered the right side of the back; perforated the right lung, the aorta, the trachea, and the left lung; then lodged in the left shoulder. The pathologist opined that the third gunshot described above caused the victim's death.

The autopsy on victim Lovelace was performed by another pathologist, who discovered six gunshot wounds: one bullet entered the right temple and lodged in the brain, a second entered the left side of the face and lodged in the left side of the head, a third entered through the left lip and exited through the jaw, a fourth entered and lodged in the chest, a fifth went through the right wrist, and a sixth went through the left hand. The wound to the left hand was caused by a bullet fired from a range of less than four or five inches; whereas, the wound to the right wrist was caused by a bullet fired from less than thirty inches away. The pathologist further opined that the bullet entering the victim's brain was the cause of death.

While the record is unclear as to how officers came to suspect that defendant and Shalan were involved in the murders, on the morning of 3 December 1993 investigators went to defendant's home with warrants for his arrest. Defendant was taken into custody and consented to allow investigators to search the home. The investigators located a jacket belonging to defendant with three .38-caliber shells in one pocket. When asked where the gun was, defendant responded that he had thrown it out the window of the car on an

entrance ramp to Interstate 85 after the robbery. Defendant was then taken to the police station, where he made a statement to the investigators. Officers were unable to locate the gun during a later search of the area indicated by defendant.

Also on the morning of 3 December 1993 investigators served an arrest warrant on Shalan. When they took Shalan into custody, investigators discovered a loaded Smith and Wesson nine-millimeter semiautomatic pistol between the mattress and box spring of the bed on which Shalan had been lying. A later search of Shalan's residence revealed a Colt Diamondback .38-caliber revolver in a foot locker. Danny Goforth, the owner of Little Dan's, testified that the Colt revolver found in Shalan's home belonged to Goforth and had been taken from its normal location behind the counter at Little Dan's.

A forensic firearms and tool-mark examiner from the State Bureau of Investigation determined that the copper-jacketed bullet found in an aisle in the store and the nine-millimeter casing found behind victim Marcrum's body were fired from the nine-millimeter Luger semiautomatic pistol seized from Shalan's home. The investigator further determined that the .38-caliber bullets retrieved from victim Lovelace's face and chest and from victim Marcrum's chest and shoulder could not have been fired from the gun stolen from Little Dan's or from Shalan's nine-millimeter; however, these bullets were consistent with the three bullets discovered in defendant's jacket. The investigator further opined that, based on his analysis of holes in the victims' clothing, the two gunshots to Marcrum's back and the gunshot to Lovelace's chest were fired from less than three feet away.

Defendant took the stand in his own defense and testified that he first heard about Little Dan's around 29 or 30 November 1993 when Adams told him it would be easy to rob. On 2 December 1993 Adams drove defendant and Shalan to various locations around Kings Mountain, finally stopping to let the two men exit the car near Little Dan's. Defendant had a .38-caliber pistol in his right pocket as he and Shalan approached the store. When defendant and Shalan entered the store, the clerk ducked below the counter and reappeared with a gun. At this point defendant's gun was "still hanging out of his pocket." Defendant testified that "everybody started shooting" and admitted that he was shooting; however, he was uncertain whether Shalan or the clerk was also shooting. Defendant stated that he shot twice from a range of five to six feet, and the clerk again ducked behind the

counter. When the clerk reappeared, defendant shot at him again. The clerk ducked behind the counter once more, leaving the gun on the counter. Defendant then saw another clerk, previously unseen by defendant. This second clerk reached for the gun on the counter. Defendant heard another shot and fired another shot himself. Defendant and Shalan then ran from the store.

Defendant stated that he shot at the first clerk because he thought the clerk was going to kill him when the clerk initially appeared from behind the counter with the gun. Defendant further stated that he did not take any money and that he did not go behind the counter. Defendant and Shalan got back into the car driven by Adams, and defendant threw his bullets and gun out the window while the car was driving on the entry ramp to Interstate 85.

On cross-examination defendant testified that on several occasions when they passed by Little Dan's immediately prior to the murders, they saw a police car in the parking lot. Defendant denied that Adams bought a pair of gloves for him at the truck stop shortly before the murders. Defendant further stated that the plan was for Adams to drive defendant and Shalan to the store and for them to rob it by merely showing their guns. Defendant admitted that he and Shalan had committed a similar robbery at a Hardee's restaurant the night they learned about Little Dan's. On that occasion upon defendant and Shalan's entering the restaurant, defendant had shown his gun to the employees without pointing it at anyone; and an employee had given them money from the register. Defendant testified that he and Shalan intended the robbery at Little Dan's to proceed in the same manner. On redirect examination defendant testified that he did not consider running away when he saw the clerk's gun. To the contrary defendant testified: "[W]henever I saw the gun, I was going to shoot back."

Additional facts will be presented as necessary to discuss specific issues.

## JURISDICTIONAL ISSUE

[1] Defendant contends that the short-form murder indictments were insufficient to charge defendant with first-degree murder as they did not allege that the murders were either committed in the course of a felony or with premeditation and deliberation. Thus, defendant argues that use of the short-form murder indictments for first-degree murder violates defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and

Article I, Sections 19 and 23 of the North Carolina Constitution. Furthermore, defendant contends that such use of the short-form murder indictments directly contravenes two recent United States Supreme Court cases. *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999); *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350 (1998). As defendant concedes, however, this Court has previously ruled against defendant's position on this issue. *See, e.g., State v. Mitchell*, 353 N.C. 309, 543 S.E.2d 830, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 389 (2001); *State v. Holman*, 353 N.C. 174, 540 S.E.2d 18 (2000), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 181 (2001); *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Defendant has presented no compelling reason why this Court should reexamine this issue, and this assignment of error is overruled.

## APPOINTMENT OF ASSISTANT COUNSEL

[2] By another assignment of error, defendant contends that he was deprived of his rights to due process and effective assistance of counsel when defendant's case was called for trial only twenty-seven days after assistant counsel was appointed. Defendant contends that assistant counsel could not adequately prepare himself to represent defendant effectively in this short period of time; thus, his constitutional rights were violated.

"An indigent person indicted for murder may not be tried where the State is seeking the death penalty without an assistant counsel being appointed in a timely manner." N.C.G.S. § 7A-450(b1) (1999). Although appointment of assistant counsel is not constitutionally required, this statute mandates timely appointment of assistant counsel where defendant is to be tried capitally. *See State v. Call*, 353 N.C. 400, 413, 545 S.E.2d 190, 199, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 548 (2001). Accordingly, pursuant to this statute, the trial court appointed Leslie A. Farfour, Jr., and W. Robinson Deaton, Jr., on 6 December 1993 to represent defendant in his capital trial. On 14 December 1993, the trial court allowed Deaton's motion to withdraw and appointed Larry Wilson to represent defendant along with Farfour. On 14 March 1994, the trial court signed a second order appointing Wilson and Farfour to represent defendant. On 22 February 1995, the trial court allowed Wilson's motion to withdraw

and appointed Calvin Coleman to serve as assistant counsel. On 21 March 1995, defendant's case was called for trial.

Defendant did not object at trial to the brevity of time for assistant counsel to prepare, nor did he move for a continuance. Defendant has, therefore, failed to properly preserve this issue for appellate review. N.C. R. App. P. 10(b)(1). Furthermore, we decline to address defendant's claim that this late withdrawal and appointment of assistant counsel implicated his constitutional rights as this Court will not consider constitutional arguments raised for the first time on appeal. *State v. Benson*, 323 N.C. 318, 321, 372 S.E.2d 517, 519 (1988). We further note that the change in assistant counsel did not affect defendant's ability to object to this alleged error. The same lead counsel represented defendant from counsel's initial appointment on 6 December 1993 until the trial began over a year later. Thus, lead counsel was in a position to determine whether the late withdrawal and appointment of assistant counsel would prejudice defendant's case and, if so, request a continuance or object to the trial date.

Defendant's assignment of error describes this alleged error as "plain error." However, we have applied plain error review only to jury instructions and evidentiary rulings. *State v. Davis*, 349 N.C. 1, 29, 506 S.E.2d 455, 470 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). Even were plain error review available for this issue, we have consistently held that a defendant must "specifically and distinctly contend" in his brief that the error constituted plain error. *State v. Cummings*, 352 N.C. 600, 636, 536 S.E.2d 36, 61 (2000), *cert. denied*, 537 U.S. 997, 149 L. Ed. 2d 641 (2001). Merely referring to the trial court's action as plain error in the assignment of error without supporting argument is, thus, insufficient to invoke such analysis. *Id.* For these reasons, we decline to address this issue.

## GUILT-INNOCENCE PHASE

[3] Defendant next contends that the trial court erred in failing to instruct the jury on second-degree murder as a lesser-included offense of first-degree murder in that the jury could reasonably have found that the State failed to prove either premeditation and deliberation or the underlying felony for the felony murder rule. As discussed below, the trial court initially granted defendant's motion during the charge conference but later told defendant that it would not submit the instruction on second-degree murder.

The test for determining whether submission of second-degree murder as a lesser-included offense is required is as follows:

"The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder."

*State v. Gary*, 348 N.C. 510, 524, 501 S.E.2d 57, 66-67 (1998) (quoting *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986)). Moreover, "[a]n instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and acquit him of the greater." *Id.* at 524, 501 S.E.2d at 67.

Defendant first argues that a rational jury could find that defendant killed the victims without premeditation and deliberation. Second-degree murder is defined as "the unlawful killing of another human being with malice but without premeditation and deliberation." *State v. Watson*, 338 N.C. 168, 176, 449 S.E.2d 694, 699 (1994), *cert. denied*, 514 U.S. 1071, 131 L. Ed. 2d 569 (1995). Thus, defendant argues, an instruction on second-degree murder was required. However, even if we assume *arguendo* that the evidence was sufficient to permit a jury rationally to determine that defendant acted without premeditation and deliberation, submission of second-degree murder would not necessarily be mandated in this case where defendant was also found guilty on the basis of felony murder.

Determination of this issue is controlled by our decision in *State v. Quick*, 329 N.C. 1, 405 S.E.2d 179 (1991). In *Quick* the trial court instructed the jury on both premeditation and deliberation and felony murder. *Id.* at 7, 405 S.E.2d at 183. The defendant argued that he was entitled to an instruction on second-degree murder as a lesser-included offense as there was evidence tending to negate premeditation and deliberation. *Id.* at 28, 405 S.E.2d at 195-96. This Court agreed that one witness' testimony tended to show the absence of premeditation and deliberation. *Id.* at 28, 405 S.E.2d at 196. However, the Court noted that inasmuch as premeditation is irrelevant to felony murder and no evidence permitted an inference that the mur-

der was not committed in the course of the commission of a felony, the trial court properly refused to instruct on second-degree murder. *Id.* at 28-29, 405 S.E.2d at 196. Similarly, in the present case the trial court instructed the jury on both premeditation and deliberation and felony murder. Thus, under *Quick*, even if we assume *arguendo* that certain evidence tended to negate premeditation, defendant is entitled to a second-degree murder instruction only if evidence also tended to show that the murder was not committed in the course of the commission of a felony.

Defendant argues that a rational jury could find that the murders were not committed during the commission of robbery with a dangerous weapon, the felony underlying the submission of felony murder to the jury. Pursuant to N.C.G.S. § 14-87, robbery with a dangerous weapon is "(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened." *State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982). "An attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result." *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987).

. Defendant contends that a rational jury could find that defendant did not commit robbery or attempted robbery, in that: (i) the evidence did not show that defendant's actions ever advanced beyond the mere plan and preparation to commit robbery; and (ii) defendant's evidence showed that he freely and voluntarily abandoned his plan to rob the store before he took or attempted to take any money. However, even were we to assume *arguendo* that a jury could find that defendant did not commit robbery or attempted robbery, the evidence was undisputed that defendant acted in concert with Shalan and that Shalan did commit robbery.

The law on acting in concert is as follows:

"[I]f 'two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.' "

*State v. Erlewine,*[1] 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991) (quoting *State v. Westbrook,* 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971), *death sentence vacated,* 408 U.S. 939, 33 L. Ed. 2d 761 (1972)) (alteration in original). The trial court in this case instructed the jury on the law of acting in concert.

By defendant's own admission, he and Shalan entered the store with the common purpose and plan to rob the store. The evidence further showed that after the clerks were felled, Shalan took a gun from one of the clerks. "A homicide victim is still a 'person,' within the meaning of a robbery statute, when the interval between the fatal blow and the taking of property is short." *State v. Pakulski,* 319 N.C. 562, 572, 356 S.E.2d 319, 325 (1987). Thus, on the uncontradicted evidence, Shalan committed armed robbery against the clerk by shooting him and taking his gun. Accordingly, under a theory of acting in concert, defendant would also be guilty of robbery with a dangerous weapon regardless of whether he actually committed, or attempted to commit, robbery himself. For this reason the evidence would not permit a rational jury to find that defendant was not engaged in the commission of a felony at the time of the murders.

Defendant's contention that the evidence shows that he abandoned his plan to rob the store is presented in support of the argument that defendant did not commit or attempt to commit a robbery. However, we also address whether such evidence could lead a rational jury to conclude that defendant no longer had a common purpose and plan with Shalan to commit the crime and, therefore, could not be convicted of robbery under a theory of acting in concert.

Where the perpetration of a felony has been entered on, one who had aided or encouraged its commission cannot escape criminal responsibility by quietly withdrawing from the scene. The influence and effect of his aiding or encouraging continues until he renounces the common purpose and makes it plain to the

---

1. We note that this definition of acting in concert was the one in effect at the time of the commission of the crime. Shortly after the murders in question the Court's opinion in *State v. Blankenship,* 337 N.C. 543, 447 S.E.2d 727 (1994), *overruled by State v. Barnes,* 345 N.C. 184, 481 S.E.2d 44, *cert. denied,* 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and* 523 U.S. 1024, 140 L. Ed. 2d 473 (1998), changed the law regarding acting in concert to require that a defendant may be convicted of a specific intent crime by acting in concert only if the jury finds that the defendant had the requisite specific intent. As the crime in this case was committed prior to the 29 September 1994 certification date in *Blankenship,* the acting in concert law as enunciated in *Erlewine* and reinstated in *Barnes* is appropriate in this case. *See State v. Evans,* 346 N.C. 221, 229, 485 S.E.2d 271, 275 (1997), *cert. denied,* 522 U.S. 1057, 139 L. Ed. 2d 653 (1998).

others that he has done so and that he does not intend to participate further.

*State v. Spears,* 268 N.C. 303, 310, 150 S.E.2d 499, 504 (1966). Although *Spears* dealt with the law of aiding and abetting, we hold that for the purposes of acting in concert the above statement is equally applicable to withdrawal from a common plan. Based on this rule no evidence supports a conclusion that defendant had withdrawn from the common plan with Shalan to commit robbery with a dangerous weapon. Any withdrawal by defendant was done silently in his own mind without any outward manifestation or communication to Shalan. Defendant exited the store with Shalan and left in the getaway car with him. For the foregoing reasons we hold that the trial court properly refused to instruct the jury on second-degree murder as a lesser-included offense to first-degree murder.

**[4]** Defendant next contends that the trial court erred in originally agreeing to instruct on second-degree murder, then, after defense counsel had begun closing arguments, directing defense counsel to tell the jury that the court had changed its mind and would not submit second-degree murder. During the charge conference the trial court agreed to instruct the jury on second-degree murder as a lesser-included offense. Based upon this initial ruling, defense counsel told the jury in his closing argument that if it found defendant guilty of murder, it should only find him guilty of second-degree murder. Counsel also stated that the verdict sheet would allow the jury to find defendant guilty of either first-degree or second-degree murder, or not guilty. The trial court later interrupted defense counsel and, outside the presence of the jury, the following colloquy ensued:

> THE COURT: I've looked at the pattern jury instructions, and I do not think second degree murder's going to be an option. I'm going to look at it some more, and I wanted to tell you before you finish your argument, so don't say anything today. Just go ahead with your argument, but we'll let you carry over until tomorrow, and I'll tell you before the day's over, but at this point, I just don't think it's going to be. . . .

> . . . .

> [DEFENSE COUNSEL]: I'm about through, obviously.

> THE COURT: But you've already talked about second [degree murder].

**STATE v. WILSON**

[354 N.C. 493 (2001)]

[DEFENSE COUNSEL]: Not really.

[PROSECUTOR]: He hasn't asked them to convict him of anything. I've been listening.

THE COURT: No, he hasn't but he's planted it. He's been jumping around all the bushes. But don't mention it right now.

After a brief recess the trial court notified counsel that it would not instruct on second-degree murder, and the following exchange occurred:

[DEFENSE COUNSEL]: We would OBJECT and EXCEPT, especially in light of the fact that I indicated to the jury that it would be submitted on second degree.

THE COURT: That's why I'm going to give you plenty of time to correct that, if you have. I listened. I didn't catch that.

[DEFENSE COUNSEL]: I told them that that would be on the verdict sheet, Your Honor. That's what I did—

THE COURT: Well, you can just tell them that I changed my mind. Blame it on me.

After resuming closing argument, defense counsel related the trial court's ruling to the jury as follows:

Now, originally, [defense counsel] told you that [defendant] could be found guilty of second degree murder. Well, that's what we were originally told by the judge. The judge changed his mind, and I'll speak to you about that later. As it stands now, he's been charged with first degree murder . . . .

. . . .

Now, I told you before that I'd talk to you again about the charge of second degree murder that the judge is not going to charge you on. He originally said he would. Now, for reasons of law—and he certainly has the right to do that—he's decided that he cannot charge you on second degree murder.

Defendant contends that he suffered prejudicial error in that the jury became informed of the court's ruling, made outside its presence, which caused defense counsel to " 'eat his words,' belittle himself and discredit his own case before the jury."

The State argues that these issues were not properly preserved for appeal under N.C. R. App. P. 10(b)(1). We disagree. The record shows that counsel objected to the trial court's decision, and counsel's objection clearly related both to the trial court's decision not to submit the instruction and the timing of the decision. Counsel stated, "We would OBJECT and EXCEPT, especially in light of the fact that I indicated to the jury that it would be submitted on second degree." A necessary consequence of the timing of the ruling was that defense counsel would have to explain his "about-face" to the jury. Thus, we hold that counsel's objection was sufficient to preserve for appeal the timing of the court's ruling and any prejudice to defendant resulting from counsel's "about-face" with the jury. However, as defendant failed to object to this issue on any constitutional basis at trial, we decline to address any constitutional arguments on this issue. *See Benson*, 323 N.C. at 321, 372 S.E.2d at 519.

We first address defendant's contention that the trial court's ruling expressed the judge's opinion on the issue of premeditation and deliberation to the jury. A trial judge "may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1999). In *State v. Allen*, 353 N.C. 504, 509-10, 546 S.E.2d 372, 375 (2001), this Court held that "[p]arties in a trial must take special care against expressing or revealing to the jury legal rulings which have been made by the trial court, as any such disclosures will have the potential for special influence with the jurors." The Court in *Allen* further noted that how the judge's opinion is conveyed to the jury, " 'whether directly or indirectly, by comment on the testimony of a witness, by arraying the evidence unequally in the charge, by imbalancing the contentions of the parties, by the choice of language in stating the contentions, or by the general tone and tenor of the trial,' " is irrelevant. *Id.* at 510, 546 S.E.2d at 376 (quoting *State v. Williamson*, 250 N.C. 204, 207, 108 S.E.2d 443, 445 (1959)).

Defendant argues that the trial court violated this principle by directing counsel to explain to the jury that the trial court had changed its ruling. However, the transcript clearly shows that the trial judge did not order defense counsel to tell the jury the court's ruling; rather, the court merely offered that counsel could blame his earlier, now incorrect, argument on the court's ruling. While the trial court erred in allowing defense counsel to "blame it on" the trial court, defendant was not forced to take that approach as the trial court stated that it would give counsel plenty of time to correct any

STATE v. WILSON

[354 N.C. 493 (2001)]

previous reference to second-degree murder. Counsel could have chosen instead to claim that he had been mistaken. As a defendant cannot claim to be prejudiced by his own conduct, N.C.G.S. § 15A-1443(c) (1999), we decline to hold that defendant's strategic choice to reveal the trial court's ruling to the jury was error entitling him to relief. *See State v. Jaynes*, 353 N.C. 534, 545, 549 S.E.2d 179, 189-90 (2001) (holding that although the trial court erred in allowing a method of jury selection that violated the jury selection statute, the defendant was not compelled to participate and, instead, chose to do so voluntarily; thus, the defendant was prejudiced by his own conduct).

Even were we to assume *arguendo* that the trial court ordered defendant to reveal the court's ruling to the jury, or that defendant was essentially forced to do so by the circumstances created by the trial court, we hold that defendant was not prejudiced by the error. The error would at most have revealed to the jury only that the trial court did not agree that the evidence supported a finding that defendant committed second-degree murder, which was no longer an issue before the jury. In fact defense counsel told the jurors that the trial court changed its ruling "for reasons of law." Thus, the jury was made aware that the action was required by law and was not based on the judge's opinion of the facts the jury was to decide. Furthermore, by the following arguments counsel actually told the jury that the State had caused the circumstances that led the judge to be unable to submit second-degree murder:

> And about that, I'm going to say that the State has more or less painted you into a corner and is daring you to come out, and I'm going to tell you why I say that.

> The legislature . . . [has] made a crime—a law—that fits just about every criminal act you can do. There are thousands of them. The State has some responsibility to charge a person with the correct crime. . . .

> Second degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation, and if that murder was done with a deadly weapon, you can infer that there was malice—

>     . . . .

> . . . The State chose, instead, to charge [defendant] with first degree murder based on malice, premeditation, deliberation.

First degree murder based on felony murder. . . . That corner that you're in is that neither of these crimes fit what [defendant] did. He could have been charged with the correct crime.

. . . .

. . . There's a calculated gamble here, I believe, that even though the crimes don't fit, by golly, you'll never let him go. . . .

. . . .

. . . [I]t would take a lot of strength to find him not guilty of these offenses. I'm not saying he's not guilty. Not guilty as charged is what I'm saying.

Thus, from this argument the jury would not deduce that the judge had expressed his opinion on the facts. Rather, the jury would more likely conclude that the State had charged defendant with the inappropriate crime and that, therefore, the trial court could not submit the appropriate crime. While this argument is in itself an inappropriate statement of the law inasmuch as a trial court must instruct on second-degree murder as a lesser-included offense if such instruction is warranted by the evidence, *see Gary*, 348 N.C. at 524, 501 S.E.2d at 67, defendant's argument clearly would have led the jury to think that the trial court's hands were bound by the State's decision and that, thus, the court's decision did not reflect its opinion on the matter.

Defendant further contends that this case is like *Allen*, where the prosecutor stated that the trial court permitted the jury to hear the words of a witness " 'because the Court found they were trustworthy and reliable. . . . If there had been anything wrong with that evidence, you would not have heard that.' " *Allen*, 353 N.C. at 508, 546 S.E.2d at 374 (alterations in original). This Court held that the trial court erred in allowing this argument. The present case is distinguishable from *Allen*, however, as the comment in question did not bolster the State's case or even imply that the trial court had an opinion as to a witness' veracity or defendant's guilt. Withdrawal of second-degree murder did not imply that the trial court thought defendant was guilty of first-degree murder. Moreover, while defendant's brief is replete with general allegations that the jury's knowledge of the trial court's ruling prejudiced defendant, he does not explain how defendant was so prejudiced. We conclude that defendant suffered no prejudice from the jury's knowledge of the court's ruling.

Defendant further contends that the trial court's reversal of its prior ruling caused defendant to be discredited before the jury to his prejudice. Defendant argues that the reversal required defense counsel to discredit their own earlier argument and appear to be "conniving, dishonest and talking out of both sides of their faces." This change in approach was, according to defendant, especially prejudicial, as counsel had told the jurors that he would not "intentionally mislead [them]."

Defendant had made only two brief references to second-degree murder in his argument prior to the trial court's decision not to submit the instruction. First, counsel argued that if the jury were to find defendant guilty it should be only of second-degree murder rather than first-degree. Second, counsel mentioned that the verdict sheet would allow the jury to find defendant guilty of first-degree murder, guilty of second-degree murder, or not guilty. The significance defense counsel attached to these prior arguments is reflected in defense counsel's statement that he had "not really" argued second-degree murder to the jury when the trial court initially considered changing its ruling. Given the brevity of these comments, any prejudice to defendant caused by the retraction was *de minimus*. Counsel had not argued that defendant was guilty of second-degree murder; he had merely argued that if defendant was guilty of anything, it was certainly not first-degree murder. Moreover, as noted above defendant chose to explain his prior argument by telling the jurors that the court had changed its ruling. Thus, counsel did not appear to go back on their word not to "intentionally mislead [the jurors]" or appear to be "conniving, dishonest and talking out of both sides of their faces"; therefore, defendant was not discredited by the contradiction. For these reasons we are not persuaded that a reasonable possibility exists that the outcome of the trial would have been different if defendant had not had to explain to the jury that second-degree murder would not be an option available to them. *See* N.C.G.S. § 15A-1443(a). These assignments of error are overruled.

[5] Defendant next contends that the trial court erred and violated defendant's state and federal constitutional rights to due process, a fair trial, and effective assistance of counsel by ordering defense counsel to tell the jury, after defendant's closing argument was completed, that one can commit armed robbery upon a person who is dead. Defense counsel had initially made the following statements to the jury:

**STATE v. WILSON**

[354 N.C. 493 (2001)]

One of the elements that the State has to prove just cannot be overcome, and that is that the defendant obtained the property by endangering or threatening the life of a person with a firearm. All of the available evidence shows that these clerks had already been shot and Shalan was on his way out of the door when he took that gun. He did not endanger anyone for the purpose of robbing them of that gun. . . .

. . . And [defendant] did not commit an armed robbery, and I'm asking you to find that the State did not prove those seven elements of armed robbery to you beyond a reasonable doubt as far as it relates to [defendant]. If the State wanted to charge Shalan with larceny, that's fine. I don't represent Shalan, but I would argue and contend that he didn't even commit an armed robbery. He didn't endanger anyone for the purpose of taking a gun. Those people, by all accounts, as sad as it is, were dead— shot when on the way out of the store, Shalan grabbed the gun.

The trial court later told defense counsel that he must "tell [the jurors] that you can commit armed robbery after the person's dead because [counsel] told them to the contrary," indicating that counsel should "clear up any misconception." Pursuant to the trial court's direction, counsel told the jury:

During the course of my deliberations with you, I may have said something that could mislead you with regard to armed robbery and whether or not an armed robbery can be committed when a person is dead. And I want to read something for you to clear that up.

"To be found guilty of robbery with a dangerous weapon, a defendant['s] threatened use or use of a dangerous weapon must precede or be co-committed [sic] with the taking or be so joined by time and circumstances with the taking as to be part of one continuous transaction."

Defendant did not object to the trial court's ruling at trial and made no argument raising a constitutional issue to the trial court. Thus, defendant has failed to preserve this issue for appellate review. N.C. R. App. P. 10(b)(1); *see also Benson*, 323 N.C. at 322, 372 S.E.2d at 519 (holding that constitutional issues not raised and passed on at trial will not be considered for the first time on appeal). Defendant further described the trial court's action as plain error in the assignment of error, although defendant's argument in the brief does not

contend that this ruling was plain error. However, as noted previously, plain error review is generally limited to jury instructions and evidentiary rulings. *Davis*, 349 N.C. at 29, 506 S.E.2d at 470. Even were plain error review available for this issue, defendant has failed to specifically allege and argue plain error. Thus, defendant has failed to preserve this issue for appeal.

Even had defendant properly preserved this issue for appeal, however, he is unable to show any prejudice from the alleged error. While counsel is allowed wide latitude in making arguments to the jury, the trial court does not abuse its discretion by sustaining an objection or otherwise correcting an argument the jury could interpret to misstate the law. *State v. McKoy*, 323 N.C. 1, 27, 372 S.E.2d 12, 26 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). In this case counsel's argument likely would have left the jury with the impression that robbery with a dangerous weapon could not occur where the property was taken from a dead person. Counsel argued that robbery did not occur because Shalan took the gun after the clerks were shot and, thus, did not endanger a life to obtain the property. However, the law is clear that "[a] homicide victim is still a 'person,' within the meaning of a robbery statute, when the interval between the fatal blow and the taking of property is short." *Pakulski*, 319 N.C. at 572, 356 S.E.2d at 325. Thus, counsel's statements could have misled a jury to think that robbery cannot be committed where the victim is dead, and the trial court properly sought to correct any possible confusion.

Defendant's argument that the statements were intended to show that as to him no robbery occurred in that the plan was aborted during the shooting and that Shalan took the gun as an afterthought is unpersuasive. First, no evidence showed that the plan to rob the store was abandoned. Second, the crux of the issue is not counsel's intent but whether the jury could be led to misunderstand the law as a result of the statement; clearly, the jury could be so misled in this case.

Defendant argues that, even if counsel did misstate the law, the trial court has no authority to delegate its duty to correct the jury's possible misinterpretation to counsel. Assuming *arguendo* that the trial court cannot delegate that duty, we conclude any error in this case was not prejudicial to defendant. Regardless of who had the duty to correct the erroneous impression, the statements had to be clarified to prevent the jury's misapplication of the law. By being allowed to tell the jury himself, counsel had the opportunity to minimize the damage to his credibility created by the correction.

Defendant also argues that the trial court's timing exacerbated the prejudice as the correction undermined defendant's entire defense. However, defendant himself contends that counsel was generally arguing that as to defendant no robbery occurred because the use of force was not done with the intention of taking the gun and that taking the gun was an afterthought. The trial court's order to correct any misperceptions as to the possibility of robbing a dead victim would, therefore, not contradict the premise of defendant's argument. We hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a). This assignment of error is without merit and is overruled.

[6] Defendant next contends that the trial court erred by denying defendant's motion to instruct the jury on imperfect self-defense, thereby violating defendant's federal and state constitutional rights. The trial court also overruled defendant's objection to submission of the following instruction to the jury: "[N]either the issue of self defense [n]or death by accident is available to the defendant, and neither are [sic] to be considered by you in connection with the accusation of first degree murder in perpetration of a felony." Defendant argues that the trial court erred in failing to submit the requested instruction, which was supported by the evidence.

"A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence." *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626, 629, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997). The law of imperfect self-defense is as follows:

[I]f the defendant believed it was necessary to kill the deceased in order to save himself from death or great bodily harm, and the defendant's belief was reasonable because the circumstances at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, but the defendant, although without murderous intent, was the aggressor or used excessive force, the defendant would have lost the benefit of perfect self-defense. In this situation he would have shown only that he exercised the imperfect right of self-defense and would remain guilty of at least voluntary manslaughter.

*State v. Bush*, 307 N.C. 152, 159, 297 S.E.2d 563, 568 (1982). However, this Court has stated that "[s]elf-defense, perfect or imperfect, is not a defense to first-degree murder under the felony murder theory, and only perfect self-defense is applicable to the underlying

felonies." *State v. Richardson*, 341 N.C. 658, 668, 462 S.E.2d 492, 499 (1995). Thus, to the extent that defendant contends that a self-defense instruction should have been submitted as to the first-degree murder charge, under *Richardson* the trial court did not err. Likewise, to the extent defendant claims he was entitled to an instruction on imperfect self-defense as to the robbery underlying the felony murder, under *Richardson* defendant was not entitled to such an instruction.

We have identified three circumstances where self-defense may properly be utilized in a case involving the felony murder rule:

> (i) a reasonable basis upon which the jury may have disbelieved the prosecution's evidence of the underlying felony, *Layne [v. State]*, 542 So. 2d [237,] 244 [(Miss. 1989)]; (ii) a factual showing that defendant clearly articulated his intent to withdraw from the situation; or (iii) a factual showing that at the time of the violence the dangerous situation no longer existed, *Gray[v. State]*, 463 P.2d [897,] 909 [(Alaska 1970)].

*State v. Bell*, 338 N.C. 363, 387, 450 S.E.2d 710, 723 (1994), *cert. denied*, 515 U.S. 1163, 132 L. Ed. 2d 861 (1995). Defendant's argument that the first circumstance existed in the present case is unpersuasive, for as previously discussed with respect to a second-degree murder instruction, no evidence tended to negate that defendant committed robbery with a dangerous weapon by acting in concert with Shalan. Though they are not argued by defendant, the other two circumstances are equally inapplicable to this case. We hold, therefore, that the trial court did not err in refusing to submit the requested instruction to the jury.

[7] Defendant next contends that the trial court erred in overruling defendant's objections to certain testimony of State Bureau of Investigation Agent Trochum and in denying defendant's motions to strike the offending statements. Trochum's testimony in question was that two of the bullet holes in the shirt of one victim would have been caused by bullets fired from a distance of less than three feet, given the type of ammunition and a "six inch barrel gun." Defendant contends that the trial court erred in overruling his objection to this testimony, as the record is devoid of any evidence that a "six inch barrel gun" was used during commission of the crimes; thus, testimony that a "six inch barrel gun" would have been fired from less than three feet from the victim was not relevant. In response to defendant's objection and motion to strike, the trial court overruled the objection and

denied the motion, but stated that counsel could "be heard at lunchtime." At the lunch break, the following transpired:

THE COURT: Now, what was the objection to the ballistic man giving an estimate as to the distance the firearm was from the shirt?

[DEFENSE COUNSEL]: Yes, sir, Your Honor, I withdraw that objection. He answered the question that I had in mind.

Rather than argue why the trial court should reverse its prior ruling, defendant chose instead to withdraw his objection. Thus, this issue was not properly preserved for appeal. *See* N.C. R. App. P. 10(b)(1). Moreover, defendant has failed to allege plain error as to this issue. Accordingly, we decline to address this assignment of error.

**[8]** Defendant contends next that the trial court erred by admitting evidence that defendant exercised his right to remain silent guaranteed by the Fifth Amendment to the United States Constitution. Prior to trial defendant moved to suppress statements given to law enforcement officers subsequent to waiving his *Miranda* rights. The trial court ruled that the State would be allowed

to introduce the initial statement down through page four of the transcript where it states, "You don't want to talk about how you got up with them yesterday or anything or what time you got together and what you done or where you went or who you talked to or –," and the defendant answered, "No." At that point, the tape will stop.

Defendant asserts that his constitutional right to remain silent was violated by this ruling in that the jury was allowed to hear evidence that defendant exercised that right. Defendant argues that while the trial court correctly ruled that defendant had invoked his right to remain silent, it erred in admitting into evidence the words spoken to invoke that right.

Assuming *arguendo* that the trial court erred in allowing the jury to hear defendant's invocation of his right to remain silent, we conclude any error would have been harmless beyond a reasonable doubt. The record discloses that at the time defendant invoked his right to remain silent, he had already admitted to the officers that he had committed the armed robbery and disposed of the gun. At trial defendant testified that he and Shalan went to Little Dan's with the intention of robbing the store and that defendant took part in the

shootout that resulted in the victims' deaths. Moreover, the prosecutor never implied that this statement was an admission of guilt. *See State v. Alexander*, 337 N.C. 182, 196, 194, 446 S.E.2d 83, 91, 90 (1994) (holding that the law enforcement officer's statement that "[the defendant] wished not to talk to me" was "relatively benign" in that the record showed that the prosecutor made no attempt to emphasize that the defendant did not speak with officers and the evidence of the defendant's guilt was substantial); *State v. Williams*, 305 N.C. 656, 674, 292 S.E.2d 243, 255 (noting that the defendant voluntarily answered some questions and that "the State did not [ask the jury to] use the defendant's request for an attorney to infer guilt"), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). On this record we cannot say as a matter of law that a reasonable probability exists that the outcome of the trial would have been different had the trial court not admitted into evidence defendant's invocation of his right to remain silent. *See* N.C.G.S. § 15A-1443(b); *see also State v. Robinson*, 336 N.C. 78, 114, 443 S.E.2d 306, 323 (1994) (holding that the pertinent inquiry is whether there is a reasonable probability that a different result would have been reached absent the error), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). Accordingly, we hold that the error, if any, was harmless beyond a reasonable doubt.

**[9]** By another assignment of error, defendant claims that the trial court erred in ordering, over defendant's objection, that defendant be restrained throughout the trial with either a shackle or a leg brace, thereby violating defendant's federal and state constitutional rights to due process and a fair trial. Defendant contends that restraint was not reasonably necessary and that the trial court made this ruling without hearing any testimony and merely acceded to the bailiff's opinion that defendant should be restrained.

This Court has stated that:

shackling of the defendant should be avoided because (1) it may interfere with the defendant's thought processes and ease of communication with counsel, (2) it intrinsically gives affront to the dignity of the trial process, and most importantly, (3) it tends to create prejudice in the minds of the jurors by suggesting that the defendant is an obviously bad and dangerous person whose guilt is a foregone conclusion.

*State v. Tolley*, 290 N.C. 349, 366, 226 S.E.2d 353, 367 (1976). Despite these concerns,

A trial judge may order a defendant or witness subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons.

N.C.G.S. § 15A-1031 (1999).

Max Blanton, an officer in charge of defendant, testified that although there had been no problems with defendant in the courtroom for hearings, officers "had a lot of trouble out of [defendant] while he's been in jail." Blanton further explained that defendant had been involved in at least two fights while in jail and had "beat [another inmate] up real bad."

After Blanton testified, the trial court ruled as follows:

> THE COURT: Okay. Because of the extreme penalty that the State seeks in this matter and because other pretrial matters have not addressed the ultimate question of what, if anything, may be at stake and knowing human nature to be such as it is, for the safety of the public, for the safety of the jurors, for the safety of the court personnel, for the safety of the attorneys, for the safety of the bailiffs and the other people involved in and around the courthouse, I feel that from a safety standpoint, shackles or a brace are called for. He has selected the brace. Over his protest, the brace will be used, and we'll move on from there.

In light of Blanton's testimony and the court's consideration of the seriousness of the charges against defendant, the trial court did not abuse its discretion in concluding that it was reasonably necessary for defendant to be restrained "from a safety standpoint." *See State v. Paige*, 316 N.C. 630, 645, 343 S.E.2d 848, 857-58 (1986) (holding that a "judge may base his findings supporting the use of restraints upon reliable information which would not be admissible as evidence at a trial"); *Tolley*, 290 N.C. at 368, 226 S.E.2d at 368 (holding that the court may consider, *inter alia*, "the seriousness of the present charge against the defendant"). Furthermore, the record is clear that the trial court made the ultimate determination on the issue after hearing Blanton's testimony; therefore, defendant's contention that the trial court allowed Blanton to determine whether defendant should be shackled is meritless.

Finally, we note that nothing in the record supports a conclusion that the restraint in this case violated defendant's constitutional

rights. The record reveals that defendant was restrained by a leg brace hidden under his clothing which might have caused him to "limp or walk stiff legged" and would lock in place when he sat down and bent his knee. To avoid any possible prejudice created by the manner in which defendant walked with the brace, the court allowed defendant to walk to the witness stand outside the presence of the jury. From outward appearances the brace was so obscured that the trial court had to be informed that defendant was wearing the brace when he next entered the courtroom. Under these circumstances, the likelihood is negligible that use of the leg brace influenced the jury to conclude that defendant is dangerous and, hence guilty. Clearly, the device did not demean the dignity of the process. Defendant does not allege that the restraint interfered with his thought process or his ability to communicate with his counsel. For the foregoing reasons we hold that the trial court did not abuse its discretion, and this assignment of error is overruled.

**[10]** Defendant next contends that the trial court erred in denying defendant's motion to dismiss the charge that he murdered Ervin Lovelace on the basis that the evidence was insufficient to find that either defendant or Shalan fired the bullet that caused Lovelace's death. In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State and give the State every reasonable inference to be drawn therefrom. *State v. Lee,* 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998). The State must present substantial evidence of each element of the offense charged. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Brown,* 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied," *State v. Locklear,* 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988); however, if the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed," *State v. Malloy,* 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

In this case defendant argues that the evidence was insufficient to show that either defendant or Shalan, with whom defendant was acting in concert, fired the bullet that killed Lovelace. Moreover, defendant argues that it is possible that the other victim fired the bul-

STATE v. WILSON

[354 N.C. 493 (2001)]

let that killed Lovelace, which would be insufficient to charge defendant with the murder. *See State v. Bonner*, 330 N.C. 536, 542, 411 S.E.2d 598, 601 (1992) (holding that there can be no criminal liability for felony murder where, "though defendants engaged in reckless and dangerous conduct, neither they nor their accomplices committed the fatal act"). A firearms expert could determine only that the bullet that killed Lovelace was larger than a .25-caliber but could not form an opinion as to what weapon may have fired the bullet. Defendant argues that, on this evidence, the jury could only speculate that either defendant or Shalan, and not the other victim, fired the fatal bullet. However, the evidence, when viewed in a light most favorable to the State, shows that the other two bullets recovered from Lovelace's body were .38-caliber, which could not have been fired from the clerk's or Shalan's gun, and that one of those bullets was consistent in weight, caliber, brand, and design with the bullets later found in defendant's jacket pocket. When all the evidence showed that only three guns were involved, a logical conclusion is that those two bullets removed from Lovelace's body were fired from defendant's gun. While neither of these bullets caused the fatal wound, the connection of these two bullets to defendant's gun constitutes substantial circumstantial evidence that the third fatal bullet was also fired from defendant's gun. Thus, while a possibility exists that the fatal bullet was fired by the other clerk, substantial circumstantial evidence, which rises above mere suspicion and conjecture, that defendant fired the fatal shot was presented. Therefore, the trial court did not err in denying defendant's motion to dismiss this charge.

## SENTENCING

[11] In his only assignment of error relating to sentencing, defendant argues that the trial court erred by aggravating his armed robbery sentence by finding that he was carrying a concealed weapon, where that evidence was also used to support the conviction. A sentence may not be aggravated by evidence supporting an element of the same offense. Aggravation of a presumptive sentence must be based upon conduct which goes beyond that normally encompassed by the crime for which the defendant is convicted. *State v. Small*, 328 N.C. 175, 190, 400 S.E.2d 413, 421 (1991).

The trial court in this case made the following oral finding:

In 93 CRS 11742, robbery with a firearm, the State has presented an aggravating factor—that is, carrying a concealed weapon. The Court finds that the factors in aggravation out-

weigh the factors in mitigation, and the defendant is confined in the custody of the State Department of Correction for a term of forty years to run consecutive to the two life sentences earlier given.

However, the trial court later made written findings as to the aggravating and mitigating factors on the "Felony Judgment Findings of Factors in Aggravation and Mitigation of Punishment" form which did not conform precisely with the oral findings. These written findings showed the sole aggravating factor relating to the robbery with a firearm conviction to be that "defendant has a prior conviction or convictions for criminal offenses punishable by more than 60 days confinement," specifically a 1990 conviction for carrying a concealed weapon.

Viewed together, the oral and written findings reflect that the oral finding was a mere *lapsus linguae*. The later written finding clarifies that the court actually considered a prior conviction for carrying a concealed weapon as the aggravating factor, not defendant's carrying of a concealed weapon in the present case. We hold that the trial court's misspoken oral finding is not controlling where the more carefully crafted and deliberate written finding, required by the Fair Sentencing Act, N.C.G.S. § 15A-1340.4(b)(1988), reveals that the trial court actually relied upon a different, proper aggravating factor. Having made this determination, we need not address whether the trial court could have properly found as an aggravating factor in this case that defendant carried a concealed weapon. This assignment of error is overruled.

For the foregoing reasons we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.

Justice BUTTERFIELD concurring.

I join in the majority opinion, but write separately to express my view that while this defendant may not have been prejudiced by the trial court's failure to give the agreed-upon instruction, the court's handling of the situation was fundamentally unfair. In my opinion, by forcing defense counsel to retract his earlier statements, the trial court may have cast aspersions on counsel's competence in the minds of the jurors. The court's actions not only required defense counsel to "eat his words," such actions also compelled him to

change the course of his argument midstream in order to deal with the court's decision to withdraw second-degree murder as a possible verdict. The obvious purpose of the charge conference is to enable counsel to know what instructions will be given so that counsel will be in a position to argue the facts in light of the law to be charged to the jury. Counsel, therefore, must be able to stand on the decisions reached by the court during the charge conference and to structure closing arguments accordingly.

Defendant's defense, as manifested in counsel's argument to the jury, was to admit some degree of culpability less than first-degree murder. At the time of the court's decision to withdraw the promised instruction, defense counsel had not specifically asked the jury to convict defendant of second-degree murder. Nonetheless, as the court noted, counsel had firmly "planted" the seed, vehemently arguing that if the jury was to find defendant guilty of anything, it should be second-degree murder, not first-degree murder. Thus, the anticipated instruction was the cornerstone of the case defense counsel constructed in his argument.

Additionally, I believe that the court's promise to instruct on second-degree murder induced the defense to acknowledge some culpability on the part of defendant. The defense's reliance on the promised instruction was compounded by the fact that prior to changing its decision, the trial court interrupted defense counsel's argument to inquire as to whether defendant consented to counsel's admission that defendant was guilty of second-degree murder, as required under State v. Harbison, 315 N.C. 175, 337 S.E.2d 504 (1985), cert. denied, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). Therefore, on these facts, the failure of the trial court to give an instruction on second-degree murder after agreeing to do so was fundamentally unfair. However, because the evidence of defendant's guilt was overwhelming, I am satisfied that the court's failure to instruct the jury as promised was harmless.